## 98 LORDS HIGHWAY, LLC *v.* ONE HUNDRED LORDS HIGHWAY, LLC, ET AL.
### (AC 33192)

Beach, Sheldon and Flynn, Js.

778

Argued February 6—officially released October 23, 2012

*Thomas L. Kanasky, Jr.,* for the appellants-cross appellees (plaintiff and counterclaim defendant Alexander Klokus).

*Edward T. Krumeich,* for the appellee-appellant (defendant Gary J. Gubner).

*Mark J. Kovack,* for the appellees-appellants (substitute defendant Victoria R. Fash Living Trust et al.).

*Opinion*

FLYNN, J. The counterclaim defendants, 98 Lords Highway, LLC (the LLC), and Alexander Klokus, appeal from the judgment of the trial court, rendered after a court trial, in favor of the counterclaim plaintiffs, Gary J. Gubner,[1] Victoria R. Fash[2] and Katherine DeSousa,[3] in an action to quiet title under General Statutes § 47-31. On appeal, the counterclaim defendants claim that the trial court erred in (1) quieting title in the absence of a necessary party; (2) allowing Fash and DeSousa to continue as counterclaim plaintiffs based only on their answers to the withdrawn complaint; and (3) not requiring the counterclaim plaintiffs to amend their pleading after Klokus was joined as a counterclaim defendant. Gubner also cross appeals, claiming that the court improperly denied his claim of title by adverse

---

[1] Beverly Gubner died in 2006, but the real property at issue in these appeals passed to and vested in her husband, Gary J. Gubner, upon her death.

[2] The Victoria R. Fash Living Trust and Victoria Fash Trustee were substituted as defendants for Victoria R. Fash by way of stipulation dated May 4, 2009.

[3] We note that DeSousa filed a motion with this court to adopt the arguments set forth in Fash's brief, which we granted on February 6, 2012, without objection.

possession to land that lies fifteen feet beyond the fence line opening shown on the survey done by Richard Meehan. We affirm in part and reverse in part the judgment of the trial court.

The following facts, as found by the court, and procedural history are relevant on appeal. The counterclaim plaintiffs are neighbors, each owning in fee simple a separate lot that abuts the LLC's property.[4] The LLC, in part, claimed to own a portion of each counterclaim plaintiff's lot, specifically, the portions of the properties that are located in an area along the western side of the LLC's property, each ranging from between twenty and forty feet in width.

On April 7, 2006, the LLC filed the initial action to quiet title under General Statutes § 47-31 (b) against the then defendants, Gubner, Fash, DeSousa, William N. Derraugh, Angelo DeCaro, Mortgage Electronic Registration Systems, Inc., One Hundred Lords Highway, LLC, and 102 Lords Highway, LLC.[5] The LLC claimed ownership in fee simple and possession of 98 Lords Highway, Weston, by virtue of a quitclaim deed recorded on April 15, 2003 at volume 343, page 750, of the Weston land records, absolute title in fee simple to the woodland lot, recorded in volume 29, page 660, and volume 28, page 401, of the Weston land records, and title to and ownership of a parcel of land on a map entitled "Perimeter Survey Prepared for Ranald McNeil, Formerly the Estate of Edith Gifford, Lords Highway, Weston, Connecticut," dated January 7, 2003, record map number 3640 in the Weston land records, which were adverse to the title of the named defendants,

[4] The LLC property is commonly referred to as the "woodland lot" among title searchers.

[5] One Hundred Lords Highway, LLC, and 102 Lords Highway, LLC, were defaulted for failure to appear. The action against Derraugh was withdrawn, and a nonsuit was entered against DeCaro and Mortgage Electronic Registration Systems, Inc.

including the counterclaim plaintiffs. The LLC filed an amended complaint on June 22, 2006, which subsequently was amended further.

Gubner filed his answer, denying the allegations of the plaintiff's complaint and raising eleven special defenses, two counterclaims, and one cross claim. Specifically relevant to his appeal, Gubner filed a counterclaim under § 47-31 seeking to quiet title to the portion of his lot that abutted the LLC's land, and he also claimed ownership by adverse possession of an area of land that lies fifteen feet beyond the opening of the fence line shown on the Meehan survey. The LLC specifically denied all of Gubner's special defenses, as well as the counterclaims set forth in his answer and reply.

Fash filed her answer on November 2, 2006, which contained specific denials of the allegations of the plaintiff's complaint and ten special defenses. She subsequently filed an amended answer on November 28, 2006, to add three additional special defenses. Fash's responsive pleading did not contain any specifically identified counterclaims, but Fash's ad damnum clause "pray[ed] that judgment enter on the Second Amended Complaint in her favor, upholding and/or quieting all of her titles, rights and/or interests to and in the real property identified in paragraph nos. '5' and '6,' above, pursuant to . . . [§] 47-31 . . . ." The LLC replied by generally denying Fash's special defenses on January 5, 2007.

On March 19, 2007, DeSousa filed her answer, along with fourteen special defenses, one counterclaim alleging a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., against the LLC, as well as one cross claim for a violation of CUTPA against One Hundred Lords Highway, LLC, and 102 Lords Highway, LLC. The LLC filed its reply and answer to DeSousa's answer, denying all allegations

related to her special defenses, as well as specifically denying the allegations of her counterclaim.

On August 31, 2010, the LLC filed a withdrawal of its complaint without prejudice with respect to all of the defendants.[6] The withdrawal was filed only two days before trial was to commence. Robert Walpuck, the sole member of the LLC, filed a release of lis pendens on the counterclaim plaintiffs' properties. Gubner's counterclaim to quiet title survived the withdrawal as a pending counterclaim and, over the LLC's objection, the trial court construed the answers and special defenses filed by Fash and DeSousa as counterclaims as well, and those counterclaims also survived the withdrawal of the complaint.

On September 1, 2010, the LLC conveyed by warranty deed all of its interest in 98 Lords Highway to Klokus.[7] The court learned of this transfer on September 8, 2010, approximately one week after evidence was slated to begin. The court subsequently ordered notice of this case to the new titleholder, Klokus. On approximately September 15, 2010, Klokus was added as a counterclaim defendant, and the trial then proceeded to its conclusion. On September 30, 2010, DeSousa filed a withdrawal of her cross claim and her CUTPA counterclaim, noting, however, that she was not withdrawing her quiet title counterclaim. That same day, Gubner filed a withdrawal of his CUTPA cross claim and counterclaim.

The court specifically found that each of the three counterclaim plaintiffs had satisfied the elements of the Marketable Record Title Act by credible evidence and,

---

[6] The court described the LLC's decision to withdraw as "strategic," insomuch that it was without prejudice and could be refiled at any time, such that the LLC's withdrawal attempted to avoid the imminent litigation while not foreclosing a future determination of the issues raised in its complaint.

[7] For purposes of these appeals, we continue to refer to both the LLC and Klokus as the counterclaim defendants.

as such, had good and marketable title in fee simple to their respective lots, including the areas originally claimed by the LLC. Furthermore, the court found in favor of the counterclaim defendants on Gubner's claim of adverse possession as to fifteen feet of land beyond the fence line. The counterclaim defendants appeal from the court's judgment quieting title in the counterclaim plaintiffs, and Gubner cross appeals from the judgment denying his claim of adverse possession as to fifteen feet of land beyond the fence line of his deeded property. Additional facts will be set forth as necessary.

## I

The counterclaim defendants first claim that the trial court lacked subject matter jurisdiction to quiet title in the land of the three counterclaim plaintiffs in the absence of a necessary party, Robert Muller. We disagree with the counterclaim defendants and conclude that the court had subject matter jurisdiction to adjudicate the matter brought before it.

We begin by setting forth our well established standard of review. "A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Connecticut Coalition Against Millstone* v. *Rocque*, 267 Conn. 116, 127–28, 836 A.2d 414 (2003). "Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it. . . . [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction . . . ." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 485, 815 A.2d 1188 (2003).

A

The counterclaim defendants argue that the court lacked subject matter jurisdiction because the counterclaim plaintiffs never joined Muller, whom the counterclaim defendants describe as a party in interest to this action. We disagree.

The allegation that Muller is a party in interest to this action stems from a deed recorded October 18, 1988, which lists Muller as the recipient of a parcel of land from the Gifford family with the same metes and bounds, excepting one portion of the premises previously separately conveyed, as the parcel that the LLC claims in fee simple. The counterclaim plaintiffs also presented testimony from their expert witness, Marc Shakin, a title searcher, who testified that in his opinion the LLC never received an interest in the woodland lot because it previously was deeded to Muller. Shakin specifically testified that, in his opinion, "98 Lords Highway claimed through a Ranald McNeil, who purchased the property—who got a deed—two deeds, actually—2002 and 2003—from a Deborah Green. It's—I told—I testified that Deborah Green did not own any realty in Weston. . . . I believe that Deborah Green conveyed nothing to this Ranald McNeil, who, in turn, had conveyed nothing to 98 Lords Highway, LLC, because the woodland lot was—was never owned by the parties . . . ."

Although it is clear that Muller was never joined as a party to the action, it is well established that the nonjoinder or misjoinder of parties or a failure to notify or join indispensable parties generally does not deprive a court of subject matter jurisdiction. General Statutes § 52-108 ("[a]n action shall not be defeated by the nonjoinder or misjoinder of parties"); *Batte-Holmgren* v. *Commissioner of Public Health*, 281 Conn. 277, 288–89, 914 A.2d 996 (2007); *Yellow Cab Co. of New London &*

*Groton, Inc.* v. *Dept. of Transportation*, 127 Conn. App. 170, 176–77, 13 A.3d 690, cert. denied, 301 Conn. 908, 19 A.3d 178 (2011); *Sullivan* v. *Thorndike*, 104 Conn. App. 297, 301, 934 A.2d 827 (2007). The exclusive remedy for nonjoinder of parties is by motion to strike. *Bauer* v. *Souto*, 277 Conn. 829, 838–39, 896 A.2d 90 (2006); Practice Book §§ 10-39 and 11-3.

In this case, although the counterclaim plaintiffs requested relief under a statute, namely, § 47-31, that requires the joining of persons who may have an adverse interest in the property, our Supreme Court has explained that the failure to join such persons is not error. *Swenson* v. *Dittner*, 183 Conn. 289, 292, 439 A.2d 334 (1981). In *Swenson*, our Supreme Court stated: "An action to quiet title is a statutory action instituted under the provisions of . . . § 47-31. The statute requires the plaintiffs to name the person or persons who may claim such adverse estate or interest. . . . So that the trial court can make a full determination of the rights of the parties to the land, an action to quiet title is brought against persons who claim title to or have an interest in the land. . . . Only the parties to an action to quiet title are bound by the judgment. . . . The failure to include [an interested party therefore] is not error because the decision to join a party in a suit to quiet title is made by the plaintiff." (Citations omitted.) Id.; but see *Gemmell* v. *Lee*, 42 Conn. App. 682, 685, 680 A.2d 346 (1996) (failure to join interested party in action to quiet title deprives court of subject matter jurisdiction). After careful consideration of the *Swenson* precedent, we conclude that the failure to join Muller did not implicate the court's subject matter jurisdiction.

B

After concluding that the court possessed subject matter jurisdiction, in an abundance of caution, we next consider whether the due process interest of Muller

was violated by proceeding with the matter without his inclusion. While failure to join indispensable parties generally does not implicate a court's subject matter jurisdiction, such failure "may implicate due process concerns that would compel a court to require notice or joinder before proceeding with the action." *Batte-Holmgren* v. *Commissioner of Public Health,* supra, 281 Conn. 289. "[A] court may refuse to proceed with litigation if a claim cannot properly be adjudicated without the presence of those indispensable persons whose substantive rights and interests will be necessarily and materially affected by its outcome. . . . Joinder of indispensable parties is mandated because due process principles make it essential that [such parties] be given notice and an opportunity to protect [their] interests by making [them] a party to the [action]. . . . *Hilton* v. *New Haven,* 233 Conn. 701, 722–23, 661 A.2d 973 (1995)." (Internal quotation marks omitted.) *Batte-Holmgren* v. *Commissioner of Public Health,* supra, 289–90.

We conclude that the failure to join Muller did not infringe on his due process rights. "[A] person who is not a party generally will not be bound by a declaratory ruling. . . . [A]n interested person who is not notified of the action is subject only to the stare decisis impact of the judgment. . . . [When] the interested person's circumstances are sufficiently different from those of the parties, the parties' representation of the nonparty's interests may have been weak, but the case will have less precedential effect on the interested person and any future action to which that person may be a party." (Citation omitted.) Id., 291. Muller, insomuch that he was not made a party to this action, is not bound by the judgment. See *Lake Garda Improvement Assn.* v. *Battistoni,* 155 Conn. 287, 294–95, 231 A.2d 276 (1967); *Sigal* v. *Hartford National Bank & Trust Co.,* 119 Conn. 570, 573, 177 A. 742 (1935). Muller's circumstances are

different from those of the parties to this action because he has a chain of title different from that of the LLC. We therefore decline to remand this case so that Muller may be joined or afforded notice.

## II

The counterclaim defendants claim that the trial court erred in allowing Fash and DeSousa to continue as counterclaim plaintiffs based only on their respective answers to the withdrawn complaint. They argue that the court lost subject matter jurisdiction over the case as to Fash and DeSousa after the LLC withdrew its complaint and that the court also improperly construed the answers of Fash and DeSousa as setting forth sufficient allegations to state counterclaims to quiet title under § 47-31 (d). We disagree.

In order to address this claim, the following additional procedural details bear repetition and enhanced detail. On August 31, 2010, the LLC withdrew its action against all of the defendants. At the time of the withdrawal, Fash had filed an amended answer and special defenses. DeSousa also had filed an answer with fourteen special defenses, one cross claim and one counterclaim. The LLC's withdrawal of its complaint was followed by two separate motions by Fash and DeSousa, on September 1 and 2, 2010, respectively, seeking permission of the court to amend each of their answers in order to clearly delineate quiet title counterclaims against the LLC pursuant to § 47-31. On September 7, 2010, the LLC filed an opposition to these motions. On September 8, 2010, after hearing argument on these motions, the court ruled from the bench that "what was plead[ed] was in effect a counterclaim—a proper counterclaim . . . despite the fact that it was labeled something else." Although the counterclaim defendants treat this as a single issue regarding Fash and DeSousa jointly, it is clear that Fash and DeSousa are in distinct

legal positions and, as such, we will address them separately after considering whether the court had subject matter jurisdiction to consider the motions to amend filed by Fash and DeSousa.

## A

The counterclaim defendants argue that, once the LLC withdrew its complaint, the case, essentially, was erased from the docket and the court was without subject matter jurisdiction to consider the motions filed by Fash and DeSousa. We disagree.

"We have long held that because [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary. . . . Moreover, [i]t is a fundamental rule that a court may raise and review the issue of subject matter jurisdiction at any time. . . . Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it. . . . [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction . . . . The subject matter jurisdiction requirement may not be waived by any party, and also may be raised by a party, or by the court sua sponte, at any stage of the proceedings, including on appeal." (Internal quotation marks omitted.) *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 532–33, 911 A.2d 712 (2006).

## 1

We will address DeSousa first, because she was in a clearer position, having filed a counterclaim in the case prior to the LLC's withdrawal of its complaint. DeSousa's counterclaim also contained multiple paragraphs with additional allegations regarding the ownership of the portion of her property that was contested. Paragraph one of DeSousa's counterclaim states: "The counterclaim plaintiff Katherine DeSousa is the record

owner in fee simple of the premises more particularly described in an executo[r's] deed, dated February 8, 1984 from The Connecticut Bank & Trust Company, N.A., of Hartford, Connecticut, as executor of the Last Will and Testament of Peter M. Fraser, Jr. to Katherine [DeSousa], and recorded in Volume 130 at Page 804 of the Weston Land Records ('DeSousa's Deed'), which deed among other things designates the property owned by Katherine DeSousa as being shown as Lot Number Ten (10) on a certain map titled 'Map of Property Developed for Rogue's Ridge Properties, Inc., Weston, Conn., Sept. 1949, Scale = 1" = 100' " on file in the office of the Town Clerk of the Town of Weston as Map No. 600 ('DeSousa's Property')." Additionally, paragraph fourteen of DeSousa's counterclaim alleges: "In furtherance of their unscrupulous and deceptive campaign of intimidation in furtherance of their scheme in the conduct of their development business, the Lords Highway Developers have, among other things:

"a. unlawfully torn down the Gubners' fence within the Gubners' Property, without seeking or obtaining the Gubners' consent or permission;

"b. improperly and unlawfully placed stakes across the width of the backyard of the Gubners' property, within just a few feet of the Gubners' swimming pool, again without seeking or obtaining the Gubners' consent or permission;

"c. upon information and belief, improperly and unlawfully placed stakes and erected a fence across the middle of the property owned by Katherine DeSousa ('DeSousa'), again without seeking or obtaining DeSousa's consent or permission . . . ."

Finally, in paragraph sixteen, DeSousa claims: "[f.] 98 Lords Highway's alleged claim is barred under the Connecticut Marketable Title Act . . . § 47-33b et seq;

"[g.] 98 Lords Highway's claim is barred because neither it nor its predecessors in title own, owned, possess or possessed the property in which it now allegedly claims an interest . . . ." In this allegation, DeSousa is alleging that she holds good marketable title to the property.

On September 30, 2010, DeSousa filed a form for withdrawal of counterclaims and cross claims, which explicitly stated that the withdrawal was for "CUTPA only; *not* quiet title." (Emphasis in original.) Despite DeSousa's withdrawal of her counterclaim with respect to the CUTPA allegations, this did not affect her allegations regarding quiet title contained, as previously described, in paragraphs one, fourteen, and sixteen of her counterclaim. These paragraphs survive DeSousa's withdrawal of her CUTPA counterclaim because they related to quiet title, not the CUTPA claim, as she specifically stated on her withdrawal form.

Practice Book § 10-55 provides in relevant part: "The withdrawal of an action after a counterclaim, whether for legal or equitable relief, has been filed therein shall not impair the right of the defendant to prosecute such counterclaim as fully as if said action had not been withdrawn . . . ." See also *Boothe* v. *Armstrong*, 76 Conn. 530, 533, 57 A. 173 (1904).

The presence of the counterclaim in DeSousa's pleading therefore provided the court with continuing subject matter jurisdiction over the matter because DeSousa's delineated counterclaim survived the LLC's withdrawal and allowed the court to retain subject matter jurisdiction.

2

Fash, however, was in a more precarious procedural position at the time the LLC filed a withdrawal of its complaint and she filed her subsequent motion because

her answer did not contain a separately delineated counterclaim. Because Fash's answer did not have a separately delineated counterclaim at the time the LLC withdrew its complaint, the LLC argued before the trial court that the court had lost its subject matter jurisdiction over Fash's case because the case involving her no longer existed. The LLC renews this argument on appeal. We, however, are not persuaded and conclude that the court's consideration of Fash's motion effectively restored the case involving her to the docket.

"The question of whether a case should be restored to the docket is one of judicial discretion. See *CFM of Connecticut, Inc.* v. *Chowdhury*, 239 Conn. 375, 391, 685 A.2d 1108 (1996)." *Sicaras* v. *Hartford*, 44 Conn. App. 771, 779, 692 A.2d 1290, cert. denied, 241 Conn. 916, 696 A.2d 340 (1997); see also *Lusas* v. *St. Patrick's Roman Catholic Church Corp.*, 123 Conn. 166, 170, 193 A. 204 (1937).

In *Lusas*, the court held that "the jurisdiction of the court to proceed further in the matter after an action has been voluntarily withdrawn is strictly analogous to that presented after the rendition of a final judgment or the erasure of a case from the docket. The court unless it is restored to the docket cannot proceed with it further but, the action still being in court, it has not gone entirely beyond the jurisdiction of the court to act in it. . . . [I]f it should be restored on motion of the plaintiff and the defendant should thereafter expressly or by implication waive any claim of lack of jurisdiction, the court could properly proceed with it. . . . There is no reason why the court has [no] jurisdiction upon a proper showing to restore to the active docket a case which has been voluntarily withdrawn, just as it can open a judgment or restore to the docket a case which has been erased." (Citations omitted.) *Lusas* v. *St. Patrick's Roman Catholic Church Corp.*, supra, 123 Conn. 170. In *Lusas*, however, the plaintiff's

motion was denied on the ground that it was filed too long after the withdrawal in a new court term. Id., 171–72.

The issue of restoring a case to the docket after voluntarily withdrawal of the action was again addressed in *CFM of Connecticut, Inc.* v. *Chowdhury*, supra, 239 Conn. 375. In that case, the trial judge had issued an order for sanctions for an attorney's bad faith pleading arising out of a breach of franchise agreement case described "as a legal quagmire out of which has grown a tangled thicket of motions, claims and counterclaims." (Internal quotation marks omitted.) Id., 377. Specifically, the underlying action had been withdrawn, but there was still a pending motion before the trial court for contempt regarding the order for sanctions. Id., 389. On appeal, the attorney argued that the court had no jurisdiction because no motion to restore the case to the docket had been filed or granted. Id. Our Supreme Court concluded, however, that "even if we were to assume that, under *Lusas*, [the trial court] was required to grant a motion to restore the case to the docket before considering the motion for contempt, we can only regard [its] actions as the functional equivalent of the granting of such a motion. To conclude otherwise would be to elevate form over substance." Id., 391.

A third notable case to take up this issue is *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 276 Conn. 168, 884 A.2d 981 (2005). In *Rosado*, our Supreme Court upheld the granting of an independent third party's motion to intervene, filed by the New York Times Company (Times), in cases that had been settled and withdrawn with prejudice approximately one year prior to the filing of the motion to intervene. Id., 172–73. Relying on *CFM of Connecticut. Inc.*, our Supreme Court reasoned that, "if the trial court had been required to grant a motion to restore the case to the docket before [acting on the motion], we can only regard [the court's] actions

as the functional equivalent of the granting of such a motion. . . .

"[T]he [trial] court exercised direct authority over the [withdrawn] cases, which had the same effect as restoring those cases to the docket. . . . [T]he trial court's exercise of jurisdiction over the documents and orders *necessarily* had the effect of restoring the withdrawn cases to the docket." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 198–99; see also *CFM of Connecticut, Inc.* v. *Chowdhury*, supra, 239 Conn. 389–92. "In other words, the [trial] court considered the [Times'] motion on its merits, just as it would have done had the Times filed, and the court granted, a motion to restore the [withdrawn] cases to the docket." (Internal quotation marks omitted.) *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 199. Our Supreme Court finally concluded that "the actions of the trial court reasonably cannot be treated as anything other than the restoration of the withdrawn cases to the docket." Id., 200–201. We conclude that if the trial court had been required to grant a motion to restore the case to the docket before acting on Fash's motion, the court's subsequent actions are the functional equivalent of the granting of such motion. See id.; *CFM of Connecticut, Inc.* v. *Chowdhury*, supra, 391.

In *CFM of Connecticut, Inc.*, our Supreme Court held that the trial court judge "considered it necessary to the due administration of justice that he decide all of these issues. . . . [H]ad he been formally presented with a motion to restore the case to the docket, he would have exercised his discretion to grant that motion as a precursor to his assumption of jurisdiction over the parties and [the attorney] in order to accomplish that necessity. [The trial court] was confronted with a case that had already consumed heroic amounts of resources of the judiciary, the parties and their counsel.

Although now formally withdrawn, the validity of that withdrawal depended on the resolution of . . . a question that [the attorney] in effect promised [the court] would surface again quickly . . . and would, therefore, consume even more such resources. . . .

"[The trial court's] action on the motions that were before [it] must be deemed to be the equivalent of restoring the case to the docket for the purpose of exercising the court's inherent powers to . . . provide for the due administration of justice." *CFM of Connecticut, Inc.* v. *Chowdhury,* supra, 239 Conn. 391–92.

Just as in *CFM of Connecticut, Inc.,* the present action before the court has been part of a "legal quagmire out of which has grown a tangled thicket of motions, claims and counterclaims." (Internal quotation marks omitted.) Id., 377. The trial judge in the present action described the situation here, opining: "This is a morass of procedural maneuvering, and I think we need to cut away the brush and get right to the roots . . . ." The current case initially was filed by the LLC in April, 2006, was set for trial and did not finally come to fruition until September 2, 2010.[8] Over that four year period, there were countless motions, memoranda, and replies filed in relation to this action. Furthermore, just as in *CFM of Connecticut, Inc.,* the court in the present case was addressing an issue that would arise again whether it was restored to the docket or brought as a separate action. The difference between restoring the case to the docket and waiting for Fash to refile and relitigate is only a matter of additional time and the expenditure of resources, both on her part and on the part of the

[8] Fash's memorandum of law in support of her motion for permission to amend claims that this action was "scheduled for trial on May 20, 2008, May 27, 2009, August 11, 2009, January 12, 2010, May 24, 2010, April 20, 2010, and June 23, 2010 and continued each time at the request of the [LLC]."

judiciary.[9] Just as our Supreme Court explained in *CFM of Connecticut, Inc.*, here, the trial judge was "exercising the court's inherent powers to . . . provide for the due administration of justice." *CFM of Connecticut, Inc.* v. *Chowdhury*, supra, 239 Conn. 392.

Unlike this action, both *CFM of Connecticut, Inc.*, and *Rosado* involved parties not at interest in the original withdrawn action.[10] In the present action, however, Fash was a named defendant and potential counterclaim plaintiff, who invested time and money into the litigation only to have the LLC withdraw its complaint on the eve of trial. Fash was not a nonparty, like the Times in *Rosado*, that the LLC had no notice of, but, rather, she was present from the filing of the first complaint. In fact, the LLC *named* Fash as a defendant, such that restoring the case to the docket for the purposes of determining whether she could amend her answer to clearly delineate her counterclaim under § 47-31 (d),[11] which would survive the LLC's withdrawal, would not prejudice the LLC. Fash's counsel was prepared to litigate the LLC's complaint as well as what was contained in Fash's pleading, but was notified that the LLC withdrew without an inquiry as to whether she had a surviving counterclaim.

[9] Fash's counsel disclosed to the court on September 2, 2010, days after the withdrawal: "[T]his is the seventh day, I think, that we are expecting to go to trial, and my client's been trying to quiet title for four years of litigation and her property's been on the market almost the entire time that this case has been pending and she can't sell it because of the cloud that the [LLC] is creating. And given that they withdraw in the case but they still have the claim, they could refile tomorrow. My client's still left with this trial." Fash's counsel alluded to the fact that the LLC withdrew the claim *without prejudice*, such that an action could be refiled against the counterclaim plaintiffs at any time.

[10] The party in *CFM of Connecticut, Inc.*, was the original trial attorney against whom sanctions were issued and the party in *Rosado* was the Times.

[11] For an explanation of why Fash's counterclaim will be measured against the requirements found in § 47-31 (d) instead of the pleading requirement found in § 47-31 (b), see part II B of this opinion.

Furthermore, the implicit restoration of Fash's matter to the docket was not temporally prejudicial. For example, the implicit restoration to the docket in *Rosado* was permitted fourteen months after the withdrawal of the underlying action with prejudice. Here, however, Fash moved for permission to amend her answer within days of the LLC's withdrawal. Surely, there is less, if any, prejudice to the parties involved when such an implied restoration to the docket occurs within days rather than more than one year after the withdrawal.

*CFM of Connecticut, Inc.*, and *Rosado* hold that, in appropriate circumstances, the Superior Court has subject matter jurisdiction to restore to the docket actions that have been unilaterally withdrawn. We therefore conclude that the trial court did have subject matter jurisdiction to consider and rule on Fash's motion.

B

We now turn to review the court's ruling that the contents of Fash's and DeSousa's pleadings contained viable counterclaims that would survive the LLC's withdrawal of its complaint.

We begin by setting forth this court's standard of review: "The plaintiff's claim implicates the trial court's construction of the pleadings. [T]he interpretation of pleadings is always a question of law for the court . . . . Our review of the trial court's interpretation of the pleadings therefore is plenary." (Citation omitted; internal quotation marks omitted.) *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 265 Conn. 79, 104, 828 A.2d 31 (2003).

"[T]he general rule is that [a] counterclaim should be pleaded in exactly the same way the claim would be pleaded in the complaint in an independent action." (Internal quotation marks omitted.) *Home Oil Co.* v. *Todd*, 195 Conn. 333, 341, 487 A.2d 1095 (1985).

Although § 47-31 (b) governs the contents of the complaint, § 47-31 (d) commands that "[e]ach defendant shall, in his answer, state," such that a counterclaim under § 47-31 must satisfy subsection (d) and not subsection (b) because subsection (d) governs how a defendant must respond to a complaint, which would include the filing of a counterclaim. Under § 47-31 (d), a defendant is required only to make a claim against the property already brought into issue by the plaintiff under § 47-31 (b), such that it would be duplicitous for the defendant's counterclaim against the plaintiff to be required to satisfy § 47-31 (b), especially since § 47-31 (d) is delineated separately to direct defendants as to how to respond by answer. Furthermore, if a pleading in accordance with § 47-31 (d) is sufficient for a defendant to quiet title as to a disputed parcel, it also should be sufficient for a counterclaim plaintiff to use to quiet title.

Section 47-31 (d) requires: "Each defendant shall, in his answer, state whether or not he claims any estate or interest in, or encumbrance on, the property, or any part of it, and, if so, the nature and extent of the estate, interest or encumbrance which he claims, and he shall set out the manner in which the estate interest or encumbrance is claimed to be derived." This is the standard against which the pleadings of Fash and DeSousa will be measured.

"In Connecticut, we long have eschewed the notion that pleadings should be read in a hypertechnical manner. Rather, [t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties. . . . Our reading of pleadings in a manner that advances substantial

justice means that a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension." (Citation omitted; internal quotation marks omitted.) *ATC Partnership* v. *Windham*, 268 Conn. 463, 466 n.4, 845 A.2d 389 (2004).

"The term [counterclaim] itself is a general and comprehensive one, naturally including within its meaning all manner of permissible counterdemands." *Boothe* v. *Armstrong*, supra, 76 Conn. 532. "[T]he word 'counterclaim' was intended to be the generic term for all cross demands other than setoffs, whether in law or in equity." *Lescoe* v. *Kinstler*, 136 Conn. 253, 255, 70 A.2d 131 (1949). A cross complaint consists of "properly pleaded . . . material facts affecting the status of the parties . . . which afforded the basis of its claim against the plaintiff, and asked for relief by way of judgment in its favor." *American Motorists Ins. Co.* v. *Weir*, 132 Conn. 557, 561, 46 A.2d 7 (1946). We now turn to analyzing each of Fash's and DeSousa's responsive pleadings separately.

1

Paragraph one of DeSousa's counterclaim, although labeled a CUTPA counterclaim, contains allegations that satisfy § 47-31 (d): "The counterclaim plaintiff Katherine DeSousa is the record owner in fee simple of the premises more particularly described in an executo[r's] deed, dated February 8, 1984 from The Connecticut Bank & Trust Company, N.A., of Hartford, Connecticut, as executor of the Last Will and Testament of Peter M. Fraser, Jr. to Katherine [DeSousa], and recorded in Volume 130 at Page 804 of the Weston Land Records ('DeSousa's Deed'), which deed among other things designates the property owned by Katherine DeSousa as being shown as Lot Number Ten (10) on a certain map

titled 'Map of Property Developed for Rogue's Ridge Properties, Inc., Weston, Conn., Sept. 1949, Scale = 1" = 100' " on file in the office of the Town Clerk of the Town of Weston as Map No. 600 ('DeSousa's Property')." In this paragraph, DeSousa claims an interest in fee simple in the disputed portion of her property and describes the deed through which her interest is claimed to be derived in full satisfaction of § 47-31 (d). This paragraph contains the properly pleaded material facts that afford the basis of DeSousa's claim against the counterclaim defendants. See *American Motorists Ins. Co.* v. *Weir,* supra, 132 Conn. 561.

Additionally, DeSousa's ad damnum clause, although delineated as relief "[a]s to plaintiff's alleged claim," requests relief in the form of "quieting title to the Disputed Property in Katherine DeSousa's favor against plaintiff pursuant to . . . § 47-31 . . . ." Furthermore, the relief DeSousa sought under her delineated counterclaim included "such other and further relief as the Court may deem just, equitable . . . ." Taken individually or together, these statements form a proper request for relief under a quiet title counterclaim. See *American Motorists Ins. Co.* v. *Weir,* supra, 132 Conn. 561. Therefore, the court was correct to hold that DeSousa had a viable counterclaim under § 47-31.

2

Despite the fact that Fash does not have a separately delineated counterclaim, the court can read her pleading reasonably to determine if she has a counterclaim that nonetheless is embedded in her responsive pleading. See *ATC Partnership* v. *Windham,* supra, 268 Conn. 466 n.4. At this time, we take note that the implied restoration of the case to the docket, as we discussed in part II A 2 of this opinion, with respect to Fash, does not mean that the parties continue on with a blank slate. To the contrary, the restoration of the case to the

docket activated the LLC's complaint to act as a matrix under which Fash's answer can be examined, read and reviewed. Let us, however, be clear that this restoration does not mean that the LLC could get judgment on its complaint, but only that the complaint is available for us to read together with Fash's answer, which referred to it, in order to determine whether the answer contained a viable counterclaim.

Paragraph five of Fash's answer provides: "As to the allegations stated in paragraph no. '5,' Fash specifically denies the plaintiff's ownership of the 'Premises,' as alleged; as to the remaining allegations contained in said paragraph, Fash admits that she claims ownership to the real property described in a Warranty Deed from Lawrence D. Paulet and Dorothy Paulet dated September 1, 1993 and recorded in Volume 211 at Page 875 of the Weston Land Records and, pursuant to . . . § 47-31 (d), affirmatively avers that her said ownership interest in said real property is absolute title in fee simple."[12]

Paragraph six of Fash's answer states: "As to the allegations stated in paragraph no. '6,' Fash specifically denies the plaintiff's ownership of the 'Premises,' as alleged; as to the remaining allegations contained in said paragraph, Fash admits that she claims ownership to the real property described in a Warranty Deed from Lawrence D. Paulet and Dorothy Paulet dated April 27, 1994 and recorded in Volume 220 at Page 332 of the Weston Land Records and, pursuant to C.G.S. § 47-31

[12] Paragraph five of the LLC's second amended complaint referenced in Fash's answer states: "The Defendant, VICTORIA R. FASH, claims ownership of a certain piece or parcel of land located in the Town of Weston, Connecticut, said Premises being located, generally, westerly of the Premises owned by 98 LORDS HIGHWAY LLC and northerly of the premises owned by Katherine [DeSousa]. Said Premises are more particularly described in a Warranty Deed from Lawrence D. Paulet and Dorothy Paulet to Victoria R. Fash dated September 1, 1993, and recorded in Volume 211 at Page 875 of the Weston Land Records."

(d), affirmatively avers that her said ownership interest in said real property is absolute title in fee simple."[13]

In *Hartford-Connecticut Trust Co.* v. *Cambell*, 95 Conn. 399, 111 A. 864 (1920), "[the defendant] had not particularly set forth his adverse [quiet title] claim. [He] was not required to set forth his claim at length; the complaint had done this, and [his] admission and partial denial satisfies the requirements of pleading under this statute. Where the complaint states truly the plaintiff's ownership and defendant's claim based on admitted facts showing the nature and extent of his title, the defendant's answer should simply admit the allegations of the complaint, and thereupon the question of law determinative of the conflicting claims of title would be in issue. In other cases the defendant must comply with the statute in stating the nature of the interest which he claims." (Internal quotation marks omitted.) Id., 402–403.

Even though both paragraphs five and six of Fash's answer deny part of the LLC's complaint and admit part of the LLC's complaint, such references are acceptable to incorporate such material facts into her counterclaim. See id. In these paragraphs, Fash also affirmatively asserts ownership interests in fee simple in the respective disputed lands under § 47-31 (d). Within each of these paragraphs, Fash claims an interest in fee simple in the disputed portion of her property and describes the deed through which her interest is claimed to be derived in full satisfaction of § 47-31 (d), thus properly

---

[13] Paragraph six of the LLC's second amended complaint states: "The Defendant, VICTORIA R. FASH, claims ownership of a certain piece or parcel of land located in the Town of Weston, Connecticut, said Premises being located, generally, westerly of the Premises owned by 98 LORDS HIGHWAY LLC and northerly of the premises owned by Victoria R. Fash. Said Premises are more particularly described in a Warranty Deed from Lawrence D. Paulet and Dorothy C. Paulet to Victoria R. Fash dated April 27, 1994, and recorded in Volume 220 at Page 332 of the Weston Land Records."

pleading the material facts affording bases for her counterclaim against the counterclaim defendants. See *American Motorists Ins. Co.* v. *Weir*, supra, 132 Conn. 561.

Additionally, and of critical importance in construing Fash's answer as a counterclaim, Fash included an ad damnum clause in her answer in which she "pray[ed] that judgment enter on the Second Amended Complaint in her favor, upholding and/or quieting all of her titles, rights and/or interests to and in the real property identified in paragraph nos. '5' and '6,' above, pursuant to . . . [§] 47-31 . . . ." The relief Fash sought is a proper request for relief under a quiet title counterclaim. See *American Motorists Ins. Co.* v. *Weir*, supra, 132 Conn. 561. Therefore, the court properly found that Fash had a viable counterclaim under § 47-31 that survived the LLC's withdrawal and under which she could proceed to trial.

We therefore conclude that the court properly construed the responsive pleadings of DeSousa and Fash to contain viable counterclaims under § 47-31.

### III

Next, the counterclaim defendants, invoking the doctrine of plain error, claim that the court erred in not requiring amendments to the counterclaim plaintiffs' pleadings after joining Klokus as a party defendant. We disagree and conclude that the court did not commit plain error in not requiring such amendments.

Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ." The counterclaim defendants concede in their brief that this issue was not raised in the trial court

and not preserved for appeal such that they seek review under the plain error doctrine. "Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 25, 664 A.2d 719 (1995).

In 2009, our Supreme Court "clarified the two step framework under which [an appellate court] review[s] claims of plain error. First, we must determine whether the court in fact committed an error and, if it did, whether that error was indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . We made clear . . . that this inquiry entails a relatively high standard, under which it is not enough for the defendant simply to demonstrate that his position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal. . . .

"In addition, although a clear and obvious mistake on the part of the trial court is a prerequisite for reversal under the plain error doctrine, such a finding is not, without more, sufficient to warrant the application of the doctrine. Because [a] party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice . . . under the second prong of the analysis we must determine whether the consequences of the error are so grievous as to be fundamentally unfair or manifestly unjust. . . . Only if both prongs of the analysis are satisfied can the appealing party obtain relief." (Internal quotation marks omitted.) *Crawford* v. *Commissioner*

*of Correction,* 294 Conn. 165, 204–205, 982 A.2d 620 (2009).

The counterclaim defendants allege that the court should have required the counterclaim plaintiffs to amend their pleadings to include Klokus in order to comply with § 47-31 (b) and allow Klokus to file an answer in accordance with § 47-31 (d). They claim that this failure to amend denied Klokus the opportunity to answer and defend his interest in the disputed land. Even if we were to assume that the failure to require such an amendment was an error in satisfaction of the first prong of the plain error test, we would be unable to conclude that the results of such a claimed error rose to the level of fundamental unfairness in satisfaction of the second prong of the test.

Despite the LLC conveying all of its interest in 98 Lords Highway to Klokus the day *before* a trial was scheduled to begin and the day *after* the LLC withdrew its complaint, and despite Walpuck's allegedly not informing Klokus about the litigation surrounding the disputed land, Klokus still received notice regarding the pendency of the action. When the court learned of the LLC's conveyance of the disputed parcel on September 8, 2010, it ordered notice both orally and by mail to Klokus and his two brothers[14] regarding the pendency of this action before the court in order to afford them the opportunity to participate in the proceedings and protect whatever interest they had at stake. On September 15, 2010, Klokus took advantage of the notice and appeared before the court, where his motion to intervene as a counterclaim defendant was granted. Klokus' counsel, Thomas Bucci, Jr., then filed his appearance with the court on October 12, 2010, and from that point forward participated in the trial on Klokus' behalf. The

[14] Walpuck testified that his three sons, including Klokus, were beneficiaries of a trust owned by the LLC.

counterclaim defendants concede in their brief that Klokus never requested any amendments or opportunity to file pleadings during trial. In fact, the record reveals that he never filed any formal pleadings, including motions, answers, special defenses or cross complaints, during the course of the proceedings. It is difficult, if not impossible, to find manifest injustice or fundamental unfairness when counsel for a client has notice of an action, oversees and participates in the trial, but does not request any amendments or opportunity to file pleadings while the trial is ongoing.

The counterclaim defendants argue that Klokus was not able to defend his interest in the disputed land via an answer in accordance with § 47-31 (d) because the court did not require the counterclaim plaintiffs to amend their pleadings to include Klokus as a party with an adverse interest in the disputed land in compliance with § 47-31 (b). General Statutes § 47-32, which pertains to parties joined as defendants, provides in relevant part that "the plaintiff may join several defendants and all causes of action relating to defects in the title to any property described in the complaint, claims against the property or affecting title to it and encumbrances on the property. In such case, the defendant shall not be required to answer or plead to any allegation of the complaint or other pleadings of the plaintiff except such as affect or pertain to the claims or defenses which he desires to interpose. . . ." It was, therefore, Klokus' prerogative to assert any claim to the disputed property or defense that he desired. Klokus could have requested that the counterclaim plaintiffs amend their pleadings. In lieu of such a request, Klokus was not required to wait for an amendment by the counterclaim plaintiffs in order to assert a claim in defense of his interest in the disputed land. To the contrary, at any time, Klokus could have asserted his own claim under § 47-31 (a).

Section 47-31 (a) provides in relevant part: "An action may be brought by any person claiming title to, or any interest in, real or personal property, or both, against any person who may . . . have any interest in the property . . . to quiet and settle the title to the property. . . ." Klokus' failure to take advantage of a multitude of methods and opportunities to assert his interest in the disputed property, despite having the assistance of counsel, fails to rise to the level of manifest injustice required for a plain error finding.

## IV

Gubner cross appeals, claiming title by adverse possession to an area fifteen feet beyond the fence line opening, as shown on the survey done by Meehan.[15] He claims in relevant part that the court improperly "misread the 'open, visible and notorious' use element as requiring proof of actual notice to the owner where the case law is clear [that] constructive notice will suffice." We agree that the trial court improperly used a heightened standard in construing the open and notorious requirement for Gubner's adverse possession claim.

"[T]o establish title by adverse possession, the claimant must oust an owner of possession and keep such owner out without interruption for fifteen years by an open, visible and exclusive possession under a claim of right with the intent to use the property as his own and without the consent of the owner. . . . A finding of adverse possession is to be made out by clear and positive proof. . . . The burden of proof is on the party

---

[15] We note that Gubner's cross appeal is regarding fifteen feet beyond the fence line opening, while the trial court's judgment against Gubner was regarding "approximately [twenty feet] of land east of the boundary lines as shown on exhibit I." Exhibit I is a map commissioned for Gubner that illustrates the eastern deed boundary, as well as a line east of that boundary depicting the area he claims through adverse possession. For purposes of his cross appeal, however, we need not determine if the fence line and the boundary lines are one and the same.

claiming adverse possession. . . . Despite that exacting standard, our scope of review is limited. . . . Because adverse possession is a question of fact for the trier . . . the court's findings . . . are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . . A trial court's findings in an adverse possession case, if supported by sufficient evidence, are binding on a reviewing court . . . ." (Citation omitted; internal quotation marks omitted.) *Bowen* v. *Serksnas*, 121 Conn. App. 503, 506–507, 997 A.2d 573 (2010). "Application of the pertinent legal standard to the trial court's factual findings [however] is subject to our plenary review." *O'Connor* v. *Larocque*, 302 Conn. 562, 576, 31 A.3d 1 (2011).

The court made the following factual findings before rendering its decision on Gubner's claim of adverse possession: "In 1980 Mr. Gubner purchased 31 Rogues Ridge Road, also known as Lot # 7 as shown on record map # 600 by warranty deed, which map also depicted the boundaries of Lot 7. . . . [H]e did not review it in detail but did consult it from time to time at the town clerk's office and, as a result, became *generally* aware of the boundaries of his property. On his property at the time of the purchase was a swimming pool, which had been constructed by a previous owner in an undisputed area of his lot and was in a state of disrepair. Gubner subsequently dismantled the pool with the intent of building a new pool somewhere near his easterly boundary and landscaping area so that it could be

used as a play area for his children. He subsequently used the remnants of that old pool from which to calculate his easterly most boundary. Once locating what he thought to be his eastern boundary, Gubner [b]egan making permanent improvements to the land, including clearing the area of underbrush, cutting some trees down, planting a lawn, trees and a garden, constructing a new aboveground swimming pool with an aboveground deck supported by posts driven into the ground. He also installed a fence around part of the perimeter of the area for the sole purpose of keeping his dog from chasing the deer that would come on his 'property.' He and his family continuously used and maintained this area for recreational purposes from approximately 1982 until the present time. However, most of the improvements [Gubner] made to this area turned out to be on the easterly side of his deeded boundary as shown on a survey map, which had been commissioned by his attorneys in preparation for this lawsuit. Until shortly before this suit was instituted, he had no idea that that area he was using was allegedly wrongful. According to Gubner, the entire area to the east of the area he cleared consisted of thick forest land. . . .

"During the entire period [Gubner] occupied the property he saw no person on the neighboring property to the east with one exception of a stranger looking for his dog. . . . In fact, he did not know who his neighbors were to the east. . . . Furthermore, he apparently could not see anyone or any thing beyond the forest. . . . He never asked anyone for permission to use the disputed area because he believed he owned it." (Citations omitted; emphasis in original.)

On the basis of these factual findings, the court then concluded: "There is no doubt that Gubner occupied/

possessed the disputed area set forth in Meehan's partial perimeter survey uninterruptedly for more than fifteen years. Gubner's problem emanates from the 'open and visible' requirement. The test to be applied is whether possession and use was sufficiently apparent to make the reasonably prudent true owner aware that his property was in jeopardy by the claimant's activities."

We conclude that the court improperly held Gubner to a higher standard in fulfilling the "open and visible" prong than that which is required under our law. Specifically, the court reasoned that Gubner's "easterly boundary consisted of thick forest land . . . [and] [t]here is no evidence that there was a road or path on or near the disputed area or any other means by which one might from time to time view the permanent improvements that Gubner was making. Therefore, from an objective perspective, it was unlikely that a reasonably prudent owner would have noticed Gubner's activities or the effect they might have on his ownership rights. . . . Gubner was 'in the boondocks.' Under such circumstances, he was required to take extraordinary measures to put an owner on notice that [that] owner's property rights were in jeopardy. The court has been unable to find a scintilla of evidence in the record to support a finding . . . on that account." (Citations omitted.) We conclude that this legal standard was improper.

"The legal significance of the open and visible element [of adverse possession] is not . . . an inquiry as to whether a record owner subjectively possessed an understanding that a claimant was attempting to claim the owner's property as his own. Rather, the open and visible element requires a fact finder to examine the extent and visibility of the claimant's use of the record owner's property so as to determine whether a reasonable owner would believe that the claimant was using

that property as his or her own. . . . In general, exclusive possession can be established by acts, which at the time, considering the state of the land, comport with ownership; viz., such acts as would ordinarily be exercised by an owner in appropriating the land to his own use and the exclusion of others. . . . Thus, the claimant's possession . . . need only be a type of possession which would characterize an owner's use. . . . It is sufficient if the acts of ownership are of such a character as to openly and publicly indicate an assumed control or use such as is consistent with the character of the premises in question." (Citation omitted; internal quotation marks omitted.) *Anderson* v. *Poirier*, 121 Conn. App. 748, 753–54, 997 A.2d 604, cert. denied, 298 Conn. 904, 3 A.3d 68 (2010). In satisfaction of the "open and visible" prong of an adverse possession claim, "[t]he location and condition of the land must be taken into consideration and the alleged acts of ownership must be understood as directed to those circumstances and conditions." (Internal quotation marks omitted.) *Lucas* v. *Crofoot*, 95 Conn. 619, 626, 112 A. 165 (1921). For example, in *Lucas*, the disputed land was Great Island, an island that "was never used by anyone to a very great extent." Id. The Supreme Court held that because of this absence of heavy use of the land, "[v]ery much less actual use of this island is necessary to establish [a] claim of ownership than would be the case of a tillable farm . . . ." Id. The land at issue in Gubner's adverse possession claim began as forest land with no road or path, such that the trial court deemed it to be " 'in the boondocks.' "[16] Such land, like Great Island, mostly was undeveloped land, likely requiring less use to satisfy the "open and visible" adverse possession prong than the heightened standard suggested by the court. See *Lucas* v. *Crofoot*, supra, 626.

---

[16] "Boondocks" is defined as "rough country filled with dense brush . . . ." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993).

In this case, the court found that Gubner made permanent improvements on the land, including, but not limited to, clearing the area of underbrush, cutting some trees down, planting a lawn, trees and a garden, and installing a fence. Such permanent improvements are uses that generally qualify as "open and visible." See *Schlichting* v. *Cotter*, 109 Conn. App. 361, 367–69, 952 A.2d 73 ("plaintiff consistently used the full extent of the disputed parcel in a manner consistent with its residential nature," including "spraying, pruning and removal of trees, planting and maintenance of [plants], removal of poison ivy from the trees and the removal of sumac from the foliage in the area, utilization of gypsy moth traps and spraying . . . the dumping, blowing and raking of leaves, the mowing and fertilizing and maintenance of the lawn area, the planting, cultivating and maintenance of the garden, and the paving, plowing, sealing and use of the driveway from 1979 to 2006"), cert. denied, 289 Conn. 944, 959 A.2d 1009 (2008).

In the present case, the trial court relied on our Supreme Court's decision in *Robinson* v. *Myers*, 156 Conn. 510, 518, 244 A.2d 385 (1968), in which the court found "no evidence that during [a] nine-year period anyone, aside from [the defendants' predecessor in title] himself and his grantor, who 'walked the boundaries' with him, knew that he was, or claimed to be, in possession of the property in dispute." We conclude, however, that the facts in *Robinson* readily can be distinguished from *Schlichting* and this case because in *Robinson* "[t]here were no physical indicia of [the defendants' predecessor in title's] claim to possession. It [did] not appear that he fenced in the area, warned off others from trespassing on it, performed any of the common acts of ownership with reference to it, or in any way marked off his claimed boundary." Id.

To the contrary, in the present case, Gubner's permanent and physical improvements to the disputed land

served as indicia of his claim to possession. Accordingly, we conclude that the trial court improperly utilized a heightened legal standard in analyzing Gubner's adverse possession claim. We conclude, therefore, that the case must be remanded to the trial court to consider Gubner's claim of adverse possession under the proper legal standard.[17]

The judgment is reversed only as to Gubner's adverse possession claim and the case is remanded for further proceedings on that claim. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[17] The counterclaim defendants also argue on appeal that the court improperly refused to determine whether they were the record owners of the property to which Gubner claims to hold title by adverse possession. They argue that "a judgment in [Gubner's] favor would be against an unknown owner or no one, to the exten[t] that the trial court did not determine a record owner of property being claimed by him to [have] been adversely possessed." We conclude that as part of a claimant's case for adverse possession, in which he or she must prove the essential elements of *ouster of an owner* of possession without interruption for fifteen years by an open, visible and exclusive possession under a claim of right with the intent to use the property as his own, without the consent of *the owner*; see *Bowen* v. *Serksnas,* supra, 121 Conn. App. 707; the court, necessarily, must determine if the claimant has proven ouster of the record owner of the property at issue.