******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

ROBERT MANERE *v.* PETER COLLINS ET AL.
(AC 42182)

DiPentima, C. J., and Elgo and Beach, Js.*

*Syllabus*

The plaintiff, a minority member of the defendant B Co., a Connecticut
limited liability company, sought to recover damages from B Co. and
the defendant C for, inter alia, breach of contract, and sought the dissolu-
tion of B Co. on the ground of oppressive conduct. The plaintiff and C
formed B Co. for the purposes of purchasing and operating a cafe. C
received a 60 percent interest in B Co. and the plaintiff received a 40
percent interest in B Co. A hurricane caused the cafe to be closed for
a period of time, and, despite an oral agreement between C and the
plaintiff that neither would take any guaranteed payments from B Co.
for fifty-two weeks, the plaintiff continued to take cash from B Co.
during this period. C subsequently reconstructed the cafe's financial
history, which revealed that the plaintiff had misappropriated approxi-
mately $190,000 of B Co.'s funds. C amended the operating agreement
of B Co., and terminated the plaintiff as a manager of B Co., terminated
the plaintiff's son as an employee, stopped payment on certain checks
issued to the plaintiff and changed the locks on the cafe to prevent
the plaintiff from accessing the building. The plaintiff commenced the
present action asserting various claims, including breach of fiduciary
duty and oppression by C, and seeking the dissolution of B Co. pursuant
to statute (§ 34-267 (a) (5)), and B Co. filed a counterclaim alleging
breach of fiduciary duty. After a bench trial, the court rendered judgment
in favor of the defendants as to all counts of the plaintiff's complaint,
and in favor of B Co. on the count of its counterclaim alleging breach
of fiduciary duty. From the judgment rendered thereon, the plaintiff
appealed to this court. *Held*:

1. The trial court properly concluded that B Co.'s counterclaim stated a
   claim on which relief could be granted: B Co. pleaded facts which
   sufficiently alleged a claim of breach of fiduciary duty, specifically, that
   the plaintiff owed a fiduciary duty to B Co., that the plaintiff breached
   that duty by acting in a manner that would personally benefit himself
   in the form of using B Co.'s funds for his own interests at the expense
   of the interests of B Co., and that B Co.'s damages were a result of the
   plaintiff's conduct; the plaintiff's emphasis on B Co.'s use of the term
   "misappropriation" was misplaced, as B Co.'s allegation that the plaintiff
   misappropriated funds was simply a recitation of facts describing con-
   duct in support of its claim for breach of fiduciary duty, rather than
   an attempt to state a cause of action for "misappropriation."

2. The trial court improperly applied a six year statute of limitations to B
   Co.'s counterclaim: notwithstanding B Co.'s claim that it had set forth
   an action for an accounting, to which a six year statute of limitations
   would apply pursuant to statute (§ 52-576), B Co.'s counterclaim did
   not allege that it either made a demand of the plaintiff to furnish an
   accounting or that the plaintiff refused its demand, instead merely
   requesting in its prayer for relief an accounting of all B Co.'s funds
   that the plaintiff misappropriated; moreover, all of B Co.'s financial
   information was available to it by the time it filed its counterclaim, as
   evidenced by its calculation of the specific amount of money that the
   plaintiff had misappropriated; thus, although B. Co's counterclaim
   alleged that the plaintiff breached a fiduciary duty, it did not properly
   allege that the plaintiff's breach of that duty necessitated an accounting,
   and the plaintiff's breach of his fiduciary duty to B Co. did not prevent
   B Co. from ascertaining the amount of money that the plaintiff misappro-
   priated; B Co.'s counterclaim, rather, set forth a claim for breach of
   fiduciary duty, which is governed by a three year statute of limitations
   under the applicable statute (§ 52-577), and, because the question of
   whether the plaintiff's tortious conduct fell within that three year period
   implicated issues of fact, the trial court's judgment was reversed and
   the case was remanded for further proceedings.

3. The trial court improperly rejected the plaintiff's application to dissolve

B Co. on the ground of oppression pursuant § 34-267 (a) (5) because that court applied an incorrect legal standard in evaluating the plaintiff's claim: this court concluded that a new trial was warranted on the plaintiff's claim of oppression as to all of the complained of conduct, except for the plaintiff's termination of employment, as it was clear from the record that the court did not assess the plaintiff's claim of oppression by focusing on his reasonable expectations as a minority member of B Co.

Argued December 5, 2019—officially released September 29, 2020

*Procedural History*

Action seeking damages for, inter alia, breach of contract, and the dissolution of the defendant BAHR, LLC, brought to the Superior Court in the judicial district of Fairfield, where the defendant BAHR, LLC, filed a counterclaim; thereafter, the matter was tried to the court, *Hon. George N. Thim*, judge trial referee; judgment in favor of the defendants on all counts of the plaintiff's complaint and in favor of the defendant BAHR, LLC, on the second count of its counterclaim, and the plaintiff appealed to this court. *Affirmed in part*; *reversed in part*; *further proceedings*.

*Alan R. Spirer*, for the appellant (plaintiff).

*Alexander H. Schwartz*, with whom was *Roy S. Ward*, for the appellees (defendants).

*Opinion*

ELGO, J. The plaintiff, Robert Manere, appeals from the judgment of the trial court, rendered after a bench trial, in favor of the defendants, Peter Collins and BAHR, LLC (BAHR). On appeal, the plaintiff claims that the court improperly (1) concluded that BAHR's counterclaim stated a claim upon which relief could be granted, (2) applied a six year statute of limitations to BAHR's counterclaim, and (3) rejected his application to dissolve BAHR on the ground of oppression pursuant to General Statutes § 34-267 (a) (5), Connecticut's limited liability company dissolution statute.[1] We agree with the plaintiff's second and third claims and, accordingly, reverse in part the judgment of the trial court.

The following facts, as found by the trial court or otherwise undisputed, and procedural history are relevant to this appeal. In 2009, the plaintiff and Collins, both graduates of the same high school, reconnected during their thirtieth high school reunion. Between the time after graduation and the reunion, both had pursued professions in the food service and bar industry. The plaintiff had experience in the restaurant business and Collins was the owner and manager of a successful bar in New York City. Still working in the Fairfield county area, the plaintiff became aware that a popular bar and restaurant establishment, Seagrape Cafe (cafe), was potentially for sale. Both the plaintiff and Collins were familiar with the cafe and its popularity among college students.

In 2011, the plaintiff and Collins formed BAHR, a Connecticut limited liability company, for the purposes of purchasing and operating the cafe. After forming BAHR, the plaintiff and Collins executed an operating agreement drafted by an attorney who previously had represented the plaintiff in unrelated business matters. The plaintiff and Collins were the sole members of BAHR, and the operating agreement designated both as its managers. Each provided capital contributions and "priority member loans"[2] to BAHR. Specifically, Collins provided a $600 capital contribution and a $149,400 priority member loan,[3] and the plaintiff provided a $400 capital contribution and a $19,600 priority member loan.[4] Due to the disparity in their respective loans, Collins received a 60 percent interest and the plaintiff received a 40 percent interest in BAHR. Thereafter, the plaintiff signed a lease on behalf of BAHR for the property on which the cafe is located and further provided a personal guarantee of BAHR's performance under the lease.

In the fall of 2011, the cafe opened under BAHR's ownership. Because Collins was living in New York City, where he operated a different establishment, the plaintiff and Collins agreed that the plaintiff would be primarily responsible for operating the cafe and acting

as its on-site manager. Prior to its opening, Collins and the plaintiff agreed that, as compensation for acting as the cafe's manager, the plaintiff would be paid a weekly salary of $600. The plaintiff's responsibilities included hiring and paying staff, obtaining stock items such as food and liquor, and accounting for revenue and expenses. Shortly after the cafe opened, the plaintiff and Collins agreed to raise the plaintiff's weekly salary to $1000 per week.[5] Unbeknownst to Collins, the plaintiff was also using BAHR funds to pay for personal expenses such as health insurance, car payments, and gas.

In October, 2012, Hurricane Sandy devastated the Fairfield county area and severely damaged the cafe premises. In addition to the cafe, a small house located on the same property, which was leased by BAHR and used as an office for BAHR affairs, sustained damage. Due to the severe impact on both the cafe and the community in which it was located, the cafe was closed for a period of time in an effort to rebuild the premises. Pursuant to their recovery plan, both the plaintiff and Collins agreed that neither would take any guaranteed payments from BAHR for a period of fifty-two weeks. Despite this oral agreement, the plaintiff continued to take cash from the business during the recovery period. For instance, the plaintiff continued to take a salary in cash and unilaterally increased that salary to $1500 per week in June, 2013. He also continued to use BAHR funds to pay for his health insurance, car payments, and gas. The plaintiff recorded these cash payments in a handwritten ledger. In October, 2013, after the fifty-two week period had ended, the plaintiff ceased taking his $1500 salary in cash and resumed issuing himself checks in that amount. He also continued to use BAHR funds to pay for personal expenses.

In 2015, Collins and his family moved to Connecticut and began to spend more time at the cafe. Due to his more active role in the cafe, Collins began to receive a weekly salary of $1000. The plaintiff thereafter reduced his weekly salary from $1500 to $1000. Later that same year, the plaintiff, Collins, and two associates of Collins opened a restaurant called the Georgetown Saloon. BAHR was not involved in this new venture. Instead, a separate limited liability company was formed for the purposes of owning and operating the Georgetown Saloon. Like his role at the cafe, the plaintiff was tasked with operating the Georgetown Saloon and acting as its on-site manager. Unlike the cafe, however, the Georgetown Saloon proved unsuccessful and closed in July, 2016. Although he did not blame the plaintiff for the Georgetown Saloon's failure, Collins became concerned with the plaintiff's style of management based on the manner in which the plaintiff conducted himself as its manager. As a result, Collins began to increasingly question the plaintiff about cafe affairs, including its finances and daily receipts.

Dissatisfied with the information he was receiving from the plaintiff, Collins began to ask cafe employees to text or e-mail him daily revenue numbers. When Collins asked the plaintiff to provide him with BAHR's business records—all of which had been relocated from the on-site office to the plaintiff's home after Hurricane Sandy—he received partial information which was often either incomplete or unresponsive. The piecemeal information provided by the plaintiff led Collins to perform his own inquiry into BAHR's records. With his wife, Collins obtained records of cash receipts and payments, bank records, tax returns, and other information in an attempt to reconstruct BAHR's financial history. Complicating this process was the fact that Collins initially did not have access to the payroll system and, due to the plaintiff's disorganized storage or outright destruction of BAHR's financial records, had only part of BAHR's financial records available to him. The trial court found that Collins' reconstruction of the cafe's financial history revealed that the plaintiff had misappropriated approximately $190,000 of BAHR funds. In March, 2017, Collins unilaterally amended the operating agreement.[6] In the amended operating agreement, the plaintiff was terminated as a manager of BAHR. In addition, the plaintiff was removed as the liquor permittee for the cafe. The plaintiff's son, who was employed as a bartender at the cafe, was also terminated as an employee. Collins thereafter stopped payment on nine $1000 checks issued to the plaintiff and changed the locks on the cafe to prevent the plaintiff from accessing the building.[7]

After taking over management of the cafe, Collins brought the building into compliance with fire safety standards. He further ensured that the cafe's staff were put on a payroll system for the purpose of placing the cafe in compliance with state and federal wage and hour laws. As a result, the cafe's revenue increased by 25 percent.

Since 2017, BAHR has not made any distributions to Collins or the plaintiff. Additionally, the plaintiff has not been provided with any information concerning BAHR's finances pursuant to the operating agreement, other than the information he received through the discovery process of the underlying litigation. Although Collins continued to receive a weekly salary of $1000 as of the time of the trial, no other payments have been made by BAHR to either Collins or the plaintiff.

In response to the measures taken by Collins, the plaintiff instituted the underlying action against Collins and BAHR, asserting a series of claims against both defendants including, inter alia, breach of contract by both defendants, breach of fiduciary duty by Collins, and oppression by Collins. The plaintiff also sought an accounting of BAHR's finances. The plaintiff further requested the dissolution of BAHR pursuant to § 34-

267 (a) (5) on the ground of oppression.[8] In response, BAHR filed an answer and brought a counterclaim against the plaintiff.[9] The plaintiff, as the counterclaim defendant, asserted four special defenses.[10] After a two day bench trial, the court, *Hon. George R. Thim*, judge trial referee, rendered judgment in favor of the defendants on all counts of the plaintiff's complaint. The court further rendered judgment in favor of BAHR on its counterclaim and awarded it $190,463.03 in damages. This appeal followed.

I

The plaintiff first challenges the propriety of the court's judgment in favor of BAHR on its counterclaim. According to the plaintiff, the counterclaim alleged a claim of misappropriation, a cause of action that is not recognized under Connecticut law. The plaintiff therefore argues that, based on its responsive pleading, BAHR did not state a claim upon which relief could be granted.[11] We disagree.

"[I]t is well settled that the [t]he failure to include a necessary allegation in a complaint precludes a recovery by the plaintiff under the complaint . . . . As a result, [i]t is incumbent on a plaintiff to allege some recognizable cause of action in his complaint. . . . Yet [w]e previously have recognized [that] . . . if the complaint puts the defendant on notice of the relevant claims, then a plaintiff's failure specifically to allege a particular fact or issue is not fatal to his claims unless it results in prejudice to the defendant." (Internal quotation marks omitted.) *Sharp Electronics Corp.* v. *Solaire Development, LLC*, 156 Conn. App. 17, 34, 111 A.3d 533 (2015). "[T]he general rule is that [a] counterclaim should be pleaded in exactly the same way the claim would be pleaded in the complaint in an independent action." (Internal quotation marks omitted.) *98 Lords Highway, LLC* v. *One Hundred Lords Highway, LLC*, 138 Conn. App. 776, 796, 54 A.3d 232 (2012).

"The interpretation of pleadings is always a question of law for the court . . . . Our review of the trial court's interpretation of the pleadings therefore is plenary." (Internal quotation marks omitted.) *Grenier* v. *Commissioner of Transportation*, 306 Conn. 523, 536, 51 A.3d 367 (2012). "In exercising that review, [w]e take the facts to be those alleged in the complaint . . . and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Moreover, we are mindful that pleadings must be construed broadly and realistically, rather than narrowly and technically." (Citation omitted; internal quotation marks omitted.) *Sharp Electronics Corp.* v. *Solaire Development, LLC*, supra, 156 Conn. App. 34. "[I]n determining the nature of a pleading filed by a party, we are not bound by the label affixed to that pleading by the party." *BNY Western Trust* v. *Roman*, 295 Conn. 194, 210, 990 A.2d 853 (2010).

Upon our review, we are convinced that BAHR, in its counterclaim, properly alleged a claim of breach of fiduciary duty. Contrary to the plaintiff's argument, it is clear from the operative pleadings that BAHR pleaded facts which sufficiently set forth that cause of action.

"The elements which must be proved to support a conclusion of breach of fiduciary duty are: [1] [t]hat a fiduciary relationship existed which gave rise to . . . a duty of loyalty . . . an obligation . . . to act in the best interests of the plaintiff, and . . . an obligation . . . to act in good faith in any matter relating to the plaintiff; [2] [t]hat the defendant advanced his or her own interests to the detriment of the plaintiff; [3] [t]hat the plaintiff sustained damages; [and] [4] [t]hat the damages were proximately caused by the fiduciary's breach of his or her financial duty." (Internal quotation marks omitted.) *Chioffi* v. *Martin*, 181 Conn. App. 111, 138, 186 A.3d 15 (2018).

Consistent with these elements, BAHR alleged, in relevant part, the following facts in its counterclaim: (1) the plaintiff held 40 percent of BAHR's membership interests; (2) until March, 2017, the plaintiff was entrusted with BAHR's day-to-day operations and control; (3) in March, 2017, Collins learned that the plaintiff had been misappropriating BAHR's assets and income by using such assets and income for his own personal benefit; (4) the plaintiff did not have, nor did he seek, permission to use BAHR's assets and income for his own personal benefit; (5) "as a member and manager of BAHR, [the] plaintiff owed the company the duty to act in good faith towards the company with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner [he] reasonably believed was in BAHR's best interest, not his own personal interests"; (6) "[the] [p]laintiff breached the duties he owed to BAHR by misappropriating and stealing its funds"; and (7) "[o]n account of [the] plaintiff's conduct, BAHR is damaged."

On the basis of our reading of BAHR's pleading, BAHR alleged (1) that the plaintiff owed a fiduciary duty to BAHR, namely, a duty to act in good faith toward the company and the company's best interests as opposed to his own, (2) the plaintiff breached that duty by acting in a manner that would personally benefit himself in the form of using BAHR funds for his own interests at the expense of the interests of BAHR, (3) BAHR sustained damages, and (4) BAHR's damages were a result of the plaintiff's conduct. Viewing those allegations in the light most favorable to sustaining its legal sufficiency; see *Sharp Electronics Corp.* v. *Solaire Development, LLC*, supra, 156 Conn. App. 34; we conclude that BAHR's counterclaim sounds in breach of fiduciary duty.

We recognize that a party "must allege breach of

fiduciary duty with specificity before liability can attach on such grounds." *Pergament* v. *Green*, 32 Conn. App. 644, 651, 630 A.2d 615, cert. denied, 228 Conn. 903, 634 A.2d 296 (1993). There is no dispute that BAHR's counterclaim does not explicitly allege the phrase "breach of fiduciary duty." Notwithstanding the absence of that phrase in BAHR's pleadings, "[t]here can . . . be no serious claim of surprise or prejudice by the [defendants] for the lack of these terms." *Morton* v. *Syriac*, 196 Conn. App. 183, 192, 229 A.3d 1129, cert. denied, 335 Conn 915, 229 A.3d 1045 (2020). Indeed, nearly all of the duties alleged in BAHR's counterclaim are fiduciary in nature. See *Murphy* v. *Wakelee*, 247 Conn. 396, 401–402, 721 A.2d 1181 (1998) ("[i]t is a thoroughly [well settled] equitable rule that any one acting in a fiduciary relation shall not be permitted to make use of that relation to benefit his own personal interest" (internal quotation marks omitted)); *Hall* v. *Schoenwetter*, 239 Conn. 553, 562, 686 A.2d 980 (1996) (plaintiff, as executrix of estate, "undertook a fiduciary duty obligating her to act in the best interests of the estate"); *Pacelli Brothers Transportation, Inc.* v. *Pacelli*, 189 Conn. 401, 407, 456 A.2d 325 (1983) (director of corporation, as fiduciary to both corporation and shareholders, "is bound to use the utmost good faith and fair dealing in all his relationships with the corporation" (internal quotation marks omitted)); *Mallory* v. *Mallory Wheeler Co.*, 61 Conn. 131, 139, 23 A. 708 (1891) (directors of company have fiduciary relationship with company and, consistent with that relationship, "have no right under any circumstances to use their official positions for their own benefit or the benefit of any one except the corporation itself"). Furthermore, we note that, as a member and manager of BAHR, the plaintiff held a fiduciary relationship with BAHR and was bound by that duty as delineated by statute. See General Statutes (Rev. to 2017) §§ 34-141 and 34-255h.[12] Because of the plaintiff's status, he owed a fiduciary duty to BAHR, "regardless of whether that duty had been specifically so labeled in the complaint." *Murphy* v. *Wakelee*, supra, 399 n.2; see Practice Book § 10-4 ("[i]t is unnecessary to allege any promise or duty which the law implies from the facts pleaded").

In addition, we reject the plaintiff's argument that BAHR's allegations were an attempt to state a cause of action for "misappropriation" based on its use of that term in its pleadings to describe the plaintiff's conduct. As the plaintiff correctly notes, our law does not recognize misappropriation as a stand-alone tort claim. But see General Statutes §§ 35-51 (b) and 35-53 (defining "[m]isappropriation" as cause of action specifically concerning misappropriation of trade secrets and providing for monetary damages under Uniform Trade Secrets Act, General Statutes § 35-50 et seq.). We believe, however, that the plaintiff's emphasis on BAHR's use of the term "misappropriation" is misplaced. BAHR's allega-

tion—that the plaintiff "misappropriated" funds—is simply a recitation of facts describing conduct in support of its claim of breach of fiduciary duty. Indeed, this court has also used the term "misappropriation" to summarize factual allegations that a defendant breached his fiduciary duty by using company funds to personally benefit himself. See *Papallo* v. *Lefebvre*, 172 Conn. App. 746, 755, 161 A.3d 603 (2017) (in describing claim of breach of fiduciary duty, noting that plaintiff alleged in operative complaint "that the defendant misappropriated LLC revenues and engaged in fraudulent conduct by inaccurately reporting those revenues and expenses"). In characterizing the plaintiff's conduct as a misappropriation of company assets, BAHR sufficiently described "the acts or omissions it believed would support a determination of liability under [its counterclaim]." *Commerce Park Associates, LLC* v. *Robbins*, 193 Conn. App. 697, 734, 220 A.3d 86 (2019), cert. denied sub nom. *Robbins Eye Center, P.C.* v. *Commerce Park Associates, LLC*, 334 Conn. 912, 221 A.3d 447 (2020), and cert. denied sub nom. *Robbins Eye Center, P.C.* v. *Commerce Park Associates, LLC*, 334 Conn. 912, 221 A.3d 448 (2020).

On the basis of the foregoing, we find no merit in the plaintiff's argument that BAHR's counterclaim is legally insufficient for a failure to state a claim upon which relief can be granted. To the contrary, BAHR sufficiently alleged facts that state a claim for breach of fiduciary duty. Accordingly, we reject the plaintiff's claim.

## II

The plaintiff next claims that the court improperly applied a six year statute of limitations to BAHR's counterclaim pursuant to General Statutes § 52-576.[13] The plaintiff argues that, because the counterclaim sounds in tort, the court was bound to apply the three year statute of limitations of General Statutes § 52-577.[14] In response, BAHR asserts that its counterclaim sets forth an action for an accounting and reasons that, because an accounting is an equitable claim, the court properly applied a six year statute of limitations. We agree with the plaintiff.

## A

Before addressing the plaintiff's claim, we note that the parties dispute whether BAHR's counterclaim sounds in tort or an accounting. Because each of these causes of action is governed by a different statute of limitations, resolving the plaintiff's claim necessarily involves an interpretation of the pleadings, our review of which is plenary. See *Grenier* v. *Commissioner of Transportation*, supra, 306 Conn. 536. We conclude that, although BAHR has sufficiently alleged and proven a claim of breach of fiduciary duty, BAHR's counterclaim does not set forth a cause of action for an

accounting.

"An accounting is defined as an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due. . . . Courts of equity have original jurisdiction to state and settle accounts, or to compel an accounting, where a fiduciary relationship exists between the parties and the defendant has a duty to render an account. . . . In an equitable proceeding, the trial court may examine all relevant factors to ensure that complete justice is done. . . . The determination of what equity requires in a particular case, the balancing of equities, is [therefore] a matter for discretion of the trial court." (Citations omitted; internal quotation marks omitted.) *Papallo* v. *Lefebvre*, supra, 172 Conn. App. 762–63. "An accounting is not available in an action where the amount due is readily ascertainable. Equity will ordinarily take jurisdiction to settle the account if the facts create a reasonable doubt whether adequate relief may be obtained at law." (Internal quotation marks omitted.) *Mankert* v. *Elmatco Products, Inc.*, 84 Conn. App. 456, 460, 854 A.2d 766, cert. denied, 271 Conn. 925, 859 A.2d 580 (2004).

"The general rule is that a prior demand by the plaintiff for an accounting and a refusal by the defendant to account is a prerequisite to the commencement of an action for an accounting." (Internal quotation marks omitted.) *Episcopal Church in the Diocese of Connecticut* v. *Gauss*, 302 Conn. 408, 452 n.30, 28 A.3d 302 (2011), cert. denied, 567 U.S. 924, 132 S. Ct. 2773, 183 L. Ed. 2d 653 (2012). "To support an action of accounting, *one* of several conditions must exist. There must be a fiduciary relationship, *or* the existence of a mutual and/ or complicated accounts, *or* a need of discovery, *or* some other special ground of equitable jurisdiction such as fraud." (Emphasis in original; internal quotation marks omitted.) *Mankert* v. *Elmatco Products, Inc.*, supra, 84 Conn. App. 460.

As this court explained in *Zuch* v. *Connecticut Bank & Trust Co.*, 5 Conn. App. 457, 461–62, 500 A.2d 565 (1985), "[w]hile there are cases which hold otherwise, the vast weight of authority in this jurisdiction requires the allegation of a demand and refusal before a party may successfully invoke the remedy of an accounting. Such a conclusion is in accord . . . with the traditional understanding of an accounting as a remedy . . . . Furthermore, the requirement of such an allegation, as a practical matter, may prevent useless litigation." (Citations omitted.)

We believe that the legal principles espoused by this court in *Zuch* are dispositive. Absent from BAHR's counterclaim are any allegations that it either made a demand of the plaintiff to furnish an accounting or that the plaintiff refused its demand. Instead, BAHR merely requested, in its prayer for relief, "[a]n accounting of all BAHR funds [the] plaintiff misappropriated." Although

BAHR may have requested an accounting in its prayer for relief, doing so does not convert that request into an actionable claim for an accounting in the absence of the necessary allegations. See *Discover Bank* v. *Hill*, 150 Conn. App. 164, 172–73 n.8, 93 A.3d 159 ("[t]he prayer for relief does not constitute a cause of action"), cert. denied, 312 Conn. 924, 94 A.3d 1203 (2014).

In addition, it is clear from the record that all of BAHR's financial information was available to it by the time it filed its counterclaim, as evidenced by its calculation of the specific amount of money that the plaintiff had misappropriated. As conceded by Collins at trial, he was able to reconstruct BAHR's finances both through the documents provided by the plaintiff and the records obtained by banking institutions.[15] BAHR received further accounting information from the plaintiff through discovery. A claim for an accounting was, therefore, not available to BAHR because it could ascertain the amount of money that it was due from the plaintiff. See *Papallo* v. *Lefebvre*, supra, 172 Conn. App. 763 ("[a]n accounting is not available in an action where the amount due is readily ascertainable" (internal quotation marks omitted)).

Upon our plenary review of the pleadings, we reject BAHR's argument that its counterclaim sets forth an action for an accounting. BAHR properly alleged, and sufficiently proved, that the plaintiff breached a fiduciary duty. BAHR did not, however, properly allege that the plaintiff's breach of that duty necessitated an accounting. BAHR's failure to allege any facts that it both demanded an accounting from the plaintiff and that the plaintiff refused its demand is fatal. Furthermore, the record reflects that the plaintiff's breach of his fiduciary duty did not prevent BAHR from ascertaining the amount of money that the plaintiff misappropriated. As discussed at length in part I of this opinion, however, we conclude that BAHR's counterclaim properly states a claim for breach of fiduciary duty.[16]

B

Having determined that BAHR's counterclaim sets forth a claim for breach of fiduciary duty, we now turn to the plaintiff's claim that the court improperly applied a six year statute of limitations. We agree.

We begin by setting forth the applicable standard of review. "The determination of which, if any, statute of limitations applies to a given action is a question of law over which our review is plenary." *Government Employees Ins. Co.* v. *Barros*, 184 Conn. App. 395, 398, 195 A.3d 431 (2018).

In its memorandum of decision, the court rejected the plaintiff's special defense that BAHR's counterclaim was barred by the three year statute of limitations provided under § 52-577. The court instead concluded that, because it found that the plaintiff did not commit lar-

ceny under the first count of the counterclaim; see footnote 9 of this opinion; "the [three year] [statute of] limitations for an action based on a tort, [§ 52-577], is inapplicable. Rather, a six year limitation, [under § 52-576], applies."

Our courts have consistently held that because breach of fiduciary duty is an action that sounds in tort, such claims are governed by a three year statute of limitations pursuant to § 52-577. See *Flannery* v. *Singer Asset Finance Co.*, *LLC*, 312 Conn. 286, 290 n.4, 94 A.3d 553 (2014); *Pasco Common Condominium Assn.*, *Inc.* v. *Benson*, 192 Conn. App. 479, 514–15, 218 A.3d 83 (2019); *Ahern* v. *Kappalumakkel*, 97 Conn. App. 189, 192 n.3, 903 A.2d 266 (2006). As previously discussed, BAHR's counterclaim unambiguously states a claim for breach of fiduciary duty. Contrary to the trial court's determination, § 52-576 does not apply because BAHR's counterclaim does not set forth a cause of action for an accounting. See part II A of this opinion. Therefore, BAHR's counterclaim was governed by § 52-577, not § 52-576. Accordingly, we conclude that the court improperly applied a six year statute of limitations to BAHR's counterclaim for breach of fiduciary duty. Because the question of whether the plaintiff's tortious conduct fell within the three year limitation period implicates issues of fact, the trial court's judgment must be reversed and remanded for further proceedings to resolve those factual issues.

### III

The plaintiff next claims that the court improperly rejected his application for a dissolution of BAHR pursuant to § 34-267 (a) (5) on the ground of oppressive conduct by Collins.[17] In response, the defendants assert that none of the actions taken by Collins amounted to oppression.[18] We conclude that the court applied an incorrect legal standard in evaluating the plaintiff's claim under § 34-267 (a) (5). We further conclude that a remand for a new trial on that claim is warranted in the present case.

We begin by setting forth the legal principles governing our review of this claim. On appeal, the plaintiff challenges the legal standard employed by the trial court. As such, "the trial court's determination of the proper legal standard in any given case is a question of law subject to our plenary review." *Fish* v. *Fish*, 285 Conn. 24, 37, 939 A.2d 1040 (2008).

### A

Section 34-267 (a) provides that a limited liability company is to be dissolved, and its "activities and affairs must be wound up" in five different circumstances. Relevant to this claim, subdivision (5), provides the following circumstance: "On application by a member, the entry by the Superior Court for the judicial district where the principal office of the limited liability com-

pany is located, of an order dissolving the company on the grounds that the managers or those members in control of the company: (A) Have acted, are acting or will act in a manner that is illegal or fraudulent; or (B) have acted or are acting in a manner that is oppressive and was, is, or will be directly harmful to the applicant . . . ." General Statutes § 34-267 (a) (5). Neither this court nor our Supreme Court has had the opportunity to define oppression as that term has been utilized in § 34-267 since its inception.

Thus, at the outset, we note that the plaintiff's claim necessarily involves interpreting and constructing a statute. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Gilmore* v. *Pawn King, Inc.*, 313 Conn. 535, 542–43, 98 A.3d 808 (2014).

1

Turning to the statute at issue in the present case, we note that the Connecticut Uniform Limited Liability Company Act (CULLCA), General Statutes § 34-243 et seq., does not define "oppression." The term "oppression," likewise, does not appear in any section of title 34 of the General Statutes, other than § 34-267 (a) (5). Furthermore, the predecessor to the current revision of § 34-267 did not delineate oppression as a basis for seeking judicial dissolution but, instead, empowered the Superior Court to order a dissolution of a limited liability company at its discretion, "whenever it is not reasonably practicable to carry on the business in conformity with the articles of organization or operating agreement." General Statutes (Rev. to 2017) § 34-207.[19]

Because the text of the CULLCA is not plain, we now turn to other materials in an effort to ascertain the legislature's intent. See *State* v. *Pond*, 315 Conn. 451, 466–67, 108 A.3d 1083 (2015). Our research yields no definition of oppression in other related statutes. See General Statutes §§ 33-896 and 33-1187 (providing for judicial dissolution of corporation based on Superior Court finding that majority shareholder engaged in oppressive conduct). A review of the legislative history

of the CULLCA has also afforded little guidance. "Because the statute and its predecessors did not define the term ['oppression'], and the legislative history of the statute is unilluminating, that task was left to the courts." *State* v. *Cyr*, 291 Conn. 49, 56, 967 A.2d 32 (2009); see also General Statutes § 34-243j ("[u]nless displaced by particular provisions of sections 34-243 to 34-283d, inclusive, the principles of law and equity supplement sections 34-243 to 34-283d, inclusive").

2

To begin our examination of extratextual sources, we believe it prudent to provide a review of the history of the oppression doctrine. It is important to emphasize that, in the context of corporation law, "oppression" is a strictly technical term. Black's Law Dictionary (11th Ed. 2019), p. 1319, defines "oppression" in this context as the "[u]nfair treatment of minority shareholders ([especially] in a close corporation) by the directors or those in control of the corporation." The history of the oppression doctrine reflects this specialized definition. As the modern corporate world began to take form during the nineteenth century, courts recognized that a pure majority rule for evaluating majority shareholder behavior "would lead to unfair results for minority shareholders" and, as a result, "used the trust metaphor to impose on directors a fiduciary duty to serve *all* of the shareholders of the corporation, not just a select group." (Emphasis in original.) D. Smith, "The Shareholder Primacy Norm," 23 J. Corp. L. 277, 310 (1998).

By the late nineteenth and early twentieth centuries, courts developed the oppression doctrine to reach conduct that the doctrines of ultra vires, fraud, and illegality did not address. See id., 310–22 (discussing history and development of oppression doctrine). Indeed, courts remained reluctant to label majority shareholder conduct as fraudulent or to extend established legal doctrines to encompass such conduct, finding these "traditional grounds for imposing liability . . . too restrictive." Id., 314, 319. Consequentially, courts "continued to redress the concerns of minority shareholders, increasingly under the rubric of minority oppression." Id., 314. Well into the twentieth century, oppression was cited as a ground for dissolution in the Illinois and Pennsylvania corporations acts in 1933, the Model Business Corporation Act of 1946, and the English Companies Act of 1948. See R. Thompson, "The Shareholder's Cause of Action for Oppression," 48 Bus. Law. 699, 709 (1993). Although the doctrine of oppression was founded at common law; see D. Smith, supra, 23 J. Corp. 320–21; it eventually developed into "the principal vehicle used by legislatures, courts, and litigants to address the particular needs of close corporations." R. Thompson, supra, 708.

3

As we have previously discussed, the legislative history does little to inform us of the legislature's intended definition of oppression under the act. A summary of the CULLCA notes that "the bill requires considering the need to promote uniformity with other states regarding LLC law when applying and construing its provisions . . . ." Office of Legislative Research, Bill Analysis, Substitute House Bill No. 5259, An Act Concerning Adoption of the Connecticut Uniform Limited Liability Company Act (April 28, 2016); see General Statutes § 34-283 ("[i]n applying and construing the provisions of the [CULLCA], consideration must be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it"). In doing so, the legislature adopted, in full, the language of the related section of the Revised Uniform Limited Liability Company Act (RULLCA). See Rev. Unif. Limited Liability Company Act of 2006 (2013) § 701, 6C U.L.A. 133 (2016); see also General Statutes § 34-267. The only difference between the related section of the RULLCA, § 701, and § 34-267 is the legislature's retention of a cause for dissolution as provided in § 34-267's predecessor statute, General Statutes (Rev. to 2017) § 34-207. See Rev.Unif. Limited Liability Company Act of 2006 (2013) § 701, supra, 6C U.L.A. 133; General Statutes (Rev. to 2017) § 34-207. Because the legislature substantially adopted the major provisions of the RULLCA, we may look to the commentaries of that uniform act for further guidance in ascertaining the legislature's intent. See *Connecticut National Bank* v. *Giacomi*, 233 Conn. 304, 320, 659 A.2d 1166 (1995) (where legislative history does not reveal legislature's intent in adoption of uniform act, "we may be assisted in ascertaining that intent by looking to commentaries" of uniform act).

As stated therein, the commentary explains that the RULLCA "does not define 'oppressively,' but 'oppression' 'is a concept [well grounded] in the law of close corporations.[20] . . . In many jurisdictions the concept equates to or at least includes the frustration of the plaintiff's reasonable expectations." (Citations omitted; footnote added.) See Rev. Unif. Limited Liability Company Act of 2006 (2013) § 701, comment, supra, 6C U.L.A. 135. Consistent with the RULLCA commentary's definition, in *R.D. Clark & Sons, Inc.* v. *Clark*, 194 Conn. App. 690, 706–707, 222 A.3d 515 (2019), this court recently defined "oppression," as used in General Statutes § 33-896 of the Connecticut Business Corporation Act, as the following: "Oppression in the context of a dissolution suit suggests a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members, or a visible departure from the standards of fair dealing and a violation of fair play as to which every shareholder who entrusts his money to a company is entitled. . . . [O]ppressive conduct in the corporate dissolution context . . . arise[s] when the controlling directors' conduct substantially defeats

expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the firm." (Internal quotation marks omitted.)

We note, however, that the broad definition of oppression, as stated in *Clark*, presents a conundrum that other jurisdictions have encountered. Both courts and scholars have underlined two competing standards that have been employed for analyzing whether conduct rises to the level of oppression: the "fair dealings" standard and the "reasonable expectations" standard. See, e.g., *Ritchie* v. *Rupe*, 443 S.W.3d 856, 865 (Tex. 2014); *Scott* v. *Trans-System, Inc.*, 148 Wn. 2d 701, 710–11, 64 P.3d 1 (2003) (en banc); cf. *Baur* v. *Baur Farms, Inc.*, 832 N.W.2d 663, 670–71 (Iowa 2013); F. O'Neal & R. Thompson, Oppression of Minority Shareholders and LLC Members (Rev. 2d Ed. 2011) § 7:11, pp. 7-113 through 7-117; see generally D. Moll, "Shareholder Oppression In Close Corporations: The Unanswered Question of Perspective," 53 Vand. L. Rev. 749 (2000) (discussing competing standards used for oppression doctrine).

Under the "fair dealings" standard, oppression occurs when the conduct complained of is "burdensome, harsh and wrongful" and evinces either "a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members" or is "a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely." (Internal quotation marks omitted.) *Ritchie* v. *Rupe*, supra, 443 S.W.3d 865. This test has been described as a focus "on preserving the majority's discretion to make decisions in furtherance of a legitimate business purpose—a standard that is typically satisfied when majority actions benefit the corporation." D. Moll, supra, 53 Vand. L. Rev. 762. Some courts employing the "fair dealings" standard have, however, cautioned that even though a majority shareholder's conduct was in furtherance of a legitimate business purpose, such conduct may be oppressive unless the minority shareholder "cannot demonstrate [that] a less harmful alternative" was available. *Daniels* v. *Thomas, Dean & Hoskins, Inc.*, 246 Mont. 125, 137–38, 804 P.2d 359 (1990).

In contrast, the "reasonable expectations" standard analyzes the conduct at issue from the perspective of the minority shareholder. As one Connecticut Superior Court decision aptly stated, oppression under this test "should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the venture." (Internal quotation marks omitted.) *Booth* v. *Waltz*, Superior Court, judicial district of Hartford, Docket No. CV-10-6011749-S (December 14, 2012);

see id. (defining oppression as that term appears in Connecticut Business Corporation Act, General Statutes § 33-600 et seq.). "This approach takes into account the fact that shareholders in close corporations may have expectations that differ substantially from those of shareholders in public corporations" and further "recognizes the fact sensitive nature of judicial inquiry into this area and the need to examine the understanding of the parties concerning their role in corporate affairs." (Internal quotation marks omitted.) *Hendrick* v. *Hendrick*, 755 A.2d 784, 791 (R.I. 2000).

No court has had the occasion to directly address the issue of which test applies to claims of oppression pursuant to the RULLCA. We are convinced that, under the CULLCA, the "reasonable expectations" test is the proper standard to be applied for analyzing claims of oppression under § 34-267 (a) (5). Our conclusion primarily rests on the commentary provided in § 701 of the RULLCA. As previously noted, the commentary emphasizes that "[i]n many jurisdictions the concept [of oppression] equates to or at least includes the frustration of the plaintiff's reasonable expectations." Rev. Unif. Limited Liability Company Act of 2006 (2013) § 701, comment, 6C U.L.A. 135. In addition, the commentary provides guidance for assessing whether conduct is oppressive. Specifically, that commentary states that "a court considering a claim of oppression by an LLC member should consider, with regard to each reasonable expectation invoked by the plaintiff, whether the expectation: (i) contradicts any term of the operating agreement or any reasonable implication of any term of that agreement; (ii) was central to the plaintiff's decision to become a member of the limited liability company or for a substantial time has been centrally important in the member's continuing membership; (iii) was known to other members, who expressly or impliedly acquiesced in it; (iv) is consistent with the reasonable expectations of all the members, including expectations pertaining to the plaintiff's conduct; and (v) is otherwise reasonable under the circumstances." Id., § 701, comment. We view this guidance as a tacit adoption of the "reasonable expectations" standard for oppression claims under the RULLCA. We see no cause or reason to suggest that the legislature intended for a different standard to apply under § 34-267 (a) (5).[21]

We further note that the majority of courts in other jurisdictions have embraced the "reasonable expectations" standard, or some iteration thereof, for claims of oppression in the close corporation context. See, e.g., *Baur* v. *Baur Farms, Inc.*, supra, 832 N.W.2d 673; *Bontempo* v. *Lare*, 444 Md. 344, 365–66, 119 A.3d 791 (2015); *Gunderson* v. *Alliance of Computer Professionals, Inc.*, 628 N.W.2d 173, 186 (Minn. App. 2001), appeal dismissed, (Minn. August 17, 2001); *Brenner* v. *Berkowitz*, 134 N.J. 488, 506–507, 634 A.2d 1019 (1993); *Matter of Kemp & Beatley, Inc.*, 64 N.Y.2d 63, 73, 473 N.E.2d

1173, 484 N.Y.S.2d 799 (1984); *Meiselman* v. *Meiselman*, 309 N.C. 279, 290, 307 S.E.2d 551 (1983); see also *Ritchie* v. *Rupe*, supra, 443 S.W.3d 901 (Guzman, J., dissenting) (collecting cases); F. O'Neal & R. Thompson, Oppression of Minority Shareholders and LLC Members (2d Rev. 2011) § 7:12, pp. 7-113 through 7-117 (collecting cases and noting that Michigan appellate court's rejection of "reasonable expectations" standard was "out of step with interpretations in the rest of the country in this area over the last three decades").

The reasons that have been cited for this widespread acceptance of the "reasonable expectations" standard largely concern the unique nature of a closely held entity. See F. O'Neal & R. Thompson, Oppression of Minority Shareholders and LLC Members (Rev. 2d Ed. 2011), § 7:12, pp. 7-113 through 7-118. "Unlike their counterparts in large corporations, minority shareholders in [close] corporations often expect to participate in management and operations." *Topper* v. *Park Sheraton Pharmacy, Inc.*, 107 Misc. 2d 25, 33, 433 N.Y.S.2d 359 (1980). For instance, "[i]t is widely understood that, in addition to supplying capital to a contemplated or ongoing enterprise and expecting a fair and equitable return, parties comprising the ownership of a close corporation may expect to be actively involved in its management and operation . . . . The small ownership cluster seeks to 'contribute their capital, skills, experience and labor' toward the corporate enterprise . . . ." (Citations omitted.) *Matter of Kemp & Beatley, Inc.*, supra, 64 N.Y.2d 71.

Like minority shareholders of a close corporation; see footnote 20 of this opinion; these unique features of an LLC therefore place a minority member in a special position, unlike his or her counterparts in a publicly traded company. As the Supreme Court of New Jersey explained in interpreting a statute with similar language, minority members of an LLC face a "unique vulnerability" for a number of reasons: "First, because the majority has a controlling interest, it has the power to dictate to the minority the manner in which the corporation is run. . . . Second, shareholders in close corporations frequently consist of family members or friends and once the personal relationship is destroyed, the company deteriorates. . . . Third, unlike shareholders in larger corporations, minority shareholders in a close corporation cannot readily sell their shares when they become dissatisfied with the management of the corporation. . . . Indeed, the discord in the corporation makes the minority stock even more difficult to sell." (Citations omitted; internal quotation marks omitted.) *Brenner* v. *Berkowitz*, supra, 134 N.J. 505. Thus, "[f]ocusing on the harm to the minority shareholder reflects a departure from the traditional focus, which was solely on the wrongdoing by those in control, and reflects the current trend of recognizing the special nature of close corporations." Id., 509.

Given that special nature and the unique position that a minority member holds, to focus on whether a majority member's conduct served a "legitimate business purpose" would, in our view, frustrate the protections that the oppression doctrine was intended to afford. See F. O'Neal & R. Thompson, Oppression of Minority Shareholders and LLC Members (Rev. 2d Ed. 2011) § 7:12, pp. 7-116 through 7-118. Thus, even when a majority member's conduct serves a legitimate business purpose that directly benefits the LLC, that conduct may be in direct contravention to a minority member's reasons for committing to the venture or the expectations that developed over time. Those reasons may have consisted of employment, a share of company earnings, or meaningful participation in its operations. See *Matter of Kemp & Beatley, Inc.*, supra, N.Y.2d 72–73; see also *Gunderson* v. *Alliance of Computer Professionals, Inc.*, supra, 628 N.W.2d 189. The majority member's reasons for excluding a minority member from any of those expectations may benefit the LLC and could very well have not been achieved by less harmful means. In such circumstances, however, the minority member is left with "neither the power to dissolve the business unit at will, as does a partner in a partnership, nor does he have the 'way out' which is open to a shareholder in a publicly held corporation, the opportunity to sell his shares on the open market. . . . Thus, the illiquidity of a minority shareholder's interest in a close corporation renders him vulnerable to exploitation by the majority shareholders." (Citation omitted.) *Meiselman* v. *Meiselman*, supra, 309 N.C. 291. In effect, the majority member is placed "in an enhanced power position to use the minority's investment without paying for it. . . . As a consequence, a [member] challenging the majority in a close corporation finds himself on the horns of a dilemma, he can neither profitably leave nor safely stay with the corporation. In reality, the only prospective buyer turns out to be the majority [member]." (Citation omitted; internal quotation marks omitted.) *Brenner* v. *Berkowitz*, supra, 134 N.J. 505.

Our conclusion is further buttressed by the fact that courts employing the "reasonable expectations" standard have looked to factors that closely track the guidance provided by the commentary of § 701 of the ULLCA. For instance, in assessing a minority member's reasonable expectations, courts have noted the relevance of the operating agreements of LLCs (or other written and oral agreements); see *Gunderson* v. *Alliance of Computer Professionals, Inc.*, supra, 628 N.W.2d 185; whether the expectations were "substantial"; see *Meiselman* v. *Meiselman*, supra, 309 N.C. 298–99; whether those expectations were both known to and consented by the other members; see id.; whether the expectations were consistent with the reasonable expectations of all the members, including expectations pertaining to the plaintiff's conduct; see *Gimpel* v.

*Bolstein*, 125 Misc. 2d 45, 52, 477 N.Y.S.2d 1014 (1984); and whether the expectations were otherwise reasonable under the circumstances. See *Harris* v. *Testar, Inc.*, 243 N.C. App. 33, 39, 777 S.E.2d 776 (2015).

In light of the foregoing, we are persuaded that a proper analysis of an oppression claim requires the court to assess that claim under the "reasonable expectations" standard. Accordingly, we conclude that oppression, under the CULLCA, properly is analyzed under that standard. Thus, a majority member's conduct is oppressive if that conduct substantially defeats the minority member's expectations which, objectively viewed, were both reasonable under the circumstances and were central to his or her decision to join the venture or developed over time.

3

Having concluded that "oppression" under § 34-267 (a) (5) should be assessed by the "reasonable expectations" standard, we believe it prudent to expand on the contours of that doctrine. As one court noted, "the key is *reasonable*." (Emphasis in original; internal quotation marks omitted.) *Meiselman* v. *Meiselman*, supra, 309 N.C. 298. In our view, the RULLCA commentary sets forth a general list of factors that courts should consider when determining the reasonableness of a minority member's expectation. As previously stated, these factors include "whether the expectation: (i) contradicts any term of the operating agreement or any reasonable implication of any term of that agreement; (ii) was central to the plaintiff's decision to become a member of the limited liability company or for a substantial time has been centrally important in the member's continuing membership; (iii) was known to other members, who expressly or impliedly acquiesced in it; (iv) is consistent with the reasonable expectations of all the members, including expectations pertaining to the plaintiff's conduct; and (v) is otherwise reasonable under the circumstances." Rev. Unif. Limited Liability Company Act of 2006 (2013) § 701, comment, 6C U.L.A., supra, p. 135.

There are a number of reasonable expectations that may drive a minority member to join an LLC by committing capital or expertise. "It is widely understood that, in addition to supplying capital to a contemplated or ongoing enterprise and expecting a fair and equal return, parties comprising the ownership of a close corporation may expect to be actively involved in its management and operation . . . ." (Citation omitted.) *Matter of Kemp & Beatley, Inc.*, supra, 64 N.Y.2d 71. "In fact, because of the unique characteristics of close corporations, employment is often a vital component of a [close corporation] [member's] return on investment and a principal source of income." *Gunderson* v. *Alliance of Computer Professionals, Inc.*, supra, 628 N.W.2d 189; see *Brenner* v. *Berkowitz*, supra, 134 N.J. 509.

Other reasonable expectations have included "possible entitlement to dividends, voting at shareholders' meetings, and access to corporate records." *Gimpel* v. *Bolstein*, supra, 125 Misc. 2d 53; see also *State ex rel. Costelo* v. *Middlesex Banking Co.*, 87 Conn. 483, 484–85, 88 A. 861 (1913) ("[t]he right of inspection of the books and records of a corporation at reasonable times and for proper purposes is a common-law privilege incident to the ownership of shares in a corporation"); cf. General Statutes § 34-255i and General Statutes (Rev. to 2017) § 34-144 (CULLCA and its predecessor, CLLCA, providing statutory right to member of LLC to inspect company records). Because employment by an LLC is typically the main source of income to members in an LLC—and due to the inherently reasonable expectation that a minority member is to receive a return on his or her investment—a change in distribution policy could, for instance, constitute oppression depending on the factual circumstances. See *Matter of Kemp & Beatley, Inc.*, supra, 64 N.Y.2d 74–75 ("[i]t was not unreasonable for the fact finder to have determined that this change in [distribution] policy amounted to nothing less than an attempt to exclude petitioners from gaining any return on their investment through the mere recharacterization of distributions of corporate income").

Notwithstanding these examples, the ULLCA factors also indicate—as do other courts—that the reasonableness of a member's expectation at the inception of an LLC may prove unreasonable over time and under particular circumstances.[22] See *Meiselman* v. *Meiselman*, supra, 309 N.C. 298 (noting that reasonable expectations can be altered over time based on conduct of shareholders). For example, a minority member may reasonably expect to be employed by the LLC when entering into the venture with other members. That expectation, however, becomes patently unreasonable when, in light of the minority member's own misconduct, he or she is terminated from that employment with the LLC. "Accordingly, an expectation of continuing employment is not reasonable and oppression liability does not arise when the shareholder-employee's own misconduct or incompetence causes the termination of employment." *Gunderson* v. *Alliance of Computer Professionals, Inc.*, supra, 628 N.W.2d 192; see *Gimpel* v. *Bolstein*, supra, 125 Misc. 2d 52–53. This also extends to a member's expectation that a relative will be employed. See *Brenner* v. *Berkowitz*, supra, 134 N.J. 517–18 ("[W]hen the employment of the shareholder's relative is at issue, the shareholder will find it even more difficult to establish that those in control of a corporation acted oppressively. A heightened burden exists particularly in the case of a relative who was not employed at the beginning of the corporate relationship.") Moreover, if a minority member does not actively pursue those reasonable expectations, a court could find that the expectation has been forfeited. See

*Brickman* v. *Brickman Estate at the Point, Inc.*, 253 App. Div. 2d 812, 813, 677 N.Y.S.2d 600 (minority shareholders were not oppressed by majority shareholders' failure to provide them with corporate records where minority shareholders failed to seek responsibilities in management or express interest in taking part in shareholders' meetings), leave to appeal denied, 92 N.Y.2d 817, 707 N.E.2d 443, 684 N.Y.S.2d 488 (1998).

In providing these examples, we must emphasize that whether a minority member's expectation is both reasonable and was defeated "will depend on the circumstances in the individual case." *Matter of Kemp & Beatley, Inc.*, supra, 64 N.Y.2d 73. Consequentially, making that determination requires the court to engage in a fact intensive inquiry. See *Gunderson* v. *Alliance of Computer Professionals, Inc.*, supra, 628 N.W.2d 186 (noting that "whether a shareholder's reasonable expectations have been frustrated is essentially a fact issue").

4

In addition to a finding of oppression, a court must determine, pursuant to § 34-267 (a) (5) (B), whether the oppressive conduct "was, is, or will be directly harmful to the applicant . . . ." Notwithstanding this additional requirement, the CULLCA, its legislative history, and the ULLCA fail to define the harm that was, is, or will be suffered by the affected member. Generally, oppression consists of harm in the form of the defeat of a member's reasonable expectation. See, e.g., *Ritchie* v. *Rupe*, supra, 443 S.W.3d 866–67 ("[g]enerally, these [oppression] statutes indicate that 'oppressive' actions involve an abuse of power *that harms the rights* or interests of another person or persons" (emphasis added)).

Nevertheless, "[i]t is a basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . Because [e]very word and phrase [of a statute] is presumed to have meaning . . . [a statute] must be construed, if possible, such that no clause, sentence or world shall be superfluous, void or insignificant." (Internal quotation marks omitted.) *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426, 433, 994 A.2d 1265 (2010). In recognition of that basic principle, we conclude that the language of § 34-267 (a) (5) (B) requires a causal connection between the oppressive conduct and the harm sustained by the plaintiff-member. This requirement reflects the precept that, not only must a plaintiff establish that the conduct in question rose to the level of oppression, but he or she "must also demonstrate a nexus between that misconduct and the minority shareholder or her interest in the corporation. The remedies that a court will apply will logically depend on the harm to the minority shareholder or her interest in the corporation. . . . Therefore, in determining the nexus between the misconduct and the harm to the shareholder, the court must con-

sider those acts that affect or jeopardize a shareholder's stock interest as well as those acts that may be specifically targeted to the shareholder." (Citation omitted.) *Brenner* v. *Berkowitz*, supra, 134 N.J. 508.

Moreover, the use of the disjunctive "or" in § 34-267 (a) (5) (B) indicates that the legislature intended for a court to consider harm that is retrospective, active, or prospective. See *State* v. *Pascucci*, 164 Conn. 69, 72, 316 A.2d 750 (1972) ("use of the disjunctive 'or' between the two parts of the statute indicates a clear legislative intent of separability" (internal quotation marks omitted)). Thus, under § 34-267 (a) (5) (B), the harm at issue is not limited to a particular instance. So long as a member was harmed, is being harmed, or will be harmed by the oppressive conduct, such will suffice to satisfy the statute. We believe that allowing a court to form a remedy for oppressive behavior based on harm that has been or will be sustained by a plaintiff is in accord with the remedial nature that the statute was intended to provide. As the Supreme Court of New Jersey explained, "[a] requirement that the [oppressive] conduct must be [ongoing] frustrates [the legislative purpose] because it allows the majority to abuse the minority so long as the abuse ceases prior to the date a decision is rendered . . . . Requiring that the conduct be continuing would, therefore, work a grave injustice on the minority shareholder by depriving her of a remedy when her reasonable expectations for the corporation are thwarted." (Citation omitted; internal quotation marks omitted.) *Brenner* v. *Berkowitz*, supra, 134 N.J. 507.

B

Turning to the facts of the present case, we conclude that the court applied an incorrect legal standard for assessing a claim alleging "oppression" pursuant to § 34-267 (a) (5). For that reason, its determination that Collins' conduct was not oppressive cannot stand.

In its memorandum of decision, the court made a number of factual findings to support its judgment in favor of Collins and BAHR with respect to the plaintiff's claim under § 34-267 (a) (5). First, the court found that Collins had authority to amend the operating agreement based on its finding that, pursuant to the original operating agreement, he maintained a 60 percent interest in BAHR based on the outstanding priority loans still owed to him by BAHR. The court further found that Collins, as the majority member in BAHR, properly used his authority to remove the plaintiff as a manager of BAHR. Pursuant to § 11 of the amended operating agreement, Collins had complete control of BAHR because he was its sole manager.[23] The court concluded that Collins' conduct in this respect "was not oppressive, harsh, or wrongful in light of [the plaintiff's] unfair dealing."

The court further found that Collins' failure to provide the plaintiff with financial documents, as required by the operating agreement, was not harmful to the plaintiff. In so finding, the court emphasized that the purpose of its requirement in the operating agreement was to enable BAHR's members to prepare their income tax statements. The court therefore concluded that the plaintiff was not harmed in this instance because all of BAHR's financial information was provided during the discovery process.

The court also rejected the plaintiff's oppression argument concerning Collins' termination of the plaintiff's son as an employee of the cafe and concerning the filing of a report with the Secretary of the State which omitted the plaintiff as a member of BAHR. The court reasoned that the plaintiff's son was terminated as an at-will employee because Collins believed that the plaintiff's son had provided incorrect information about the cafe's revenue. It further noted that the failure to file an accurate report with the Secretary of the State did "not appear to have been done with any intent to harm [the plaintiff]. This omission can be easily remedied. No harm has been shown."

Thus, the court concluded that the plaintiff failed to show that BAHR "should be dissolved under the provisions of [§ 34-267 (a) (5)]. He has not shown [Collins'] conduct was illegal, oppressive, or in violation of [the plaintiff's] rights as a shareholder of BAHR. He has not shown that Collins has acted or is acting in a manner that is directly harmful to [the plaintiff]. Rather, the managerial actions taken by Collins were reasonable in light of [the plaintiff's] having used BAHR funds to pay personal expenses and his having withdrawn weekly 'salary' payments contrary to his agreement with Collins."

To begin, the court's memorandum of decision reflects that it did not employ the correct legal standard for determining whether the defendants' conduct was oppressive.[24] This, of course, is understandable because no appellate court in this state has interpreted either the oppression doctrine or the term "oppression" as it appears in § 34-267 (a) (5). "Ordinarily, the trial court's failure to apply the correct legal standard . . . results in a remand to the trial court for application of the correct standard."[25] *Western Dermatology Consultants, P.C.* v. *VitalWorks, Inc.*, 322 Conn. 541, 563, 153 A.3d 574 (2016). This is so "unless we conclude that, based on the evidence, a new trial would be pointless." *McDermott* v. *State*, 316 Conn. 601, 611, 113 A.3d 419 (2015).

In light of the evidence and the factual findings made by the court, we conclude that a new trial is warranted on the plaintiff's claim of oppression for all of the complained of conduct except for his termination of employment. It is clear from the record that the court did not

assess the plaintiff's claim of oppression by focusing on his reasonable expectations as a minority member. Instead, the court improperly concentrated its analysis on Collins' conduct as a majority member in response to the plaintiff's misconduct as a manager of BAHR.

Notwithstanding the court's use of an incorrect legal standard, we believe that a new trial on the particular issue of the plaintiff's termination from employment is unwarranted. See *McDermott* v. *State*, supra, 316 Conn. 611. That is so because the reasonable expectations standard applied to the evidence adduced at trial would not change the court's factual findings or conclusion; specifically, the plaintiff's misappropriation of BAHR's funds would render any expectation of continuing employment by BAHR or the cafe unreasonable. See *Gunderson* v. *Alliance of Computer Professionals, Inc.*, supra, 628 N.W.2d 192. Upon our review of the record, the evidence strongly supports the court's conclusion that Collins' assumption of control over the management of the cafe "was not oppressive . . . in light of [the plaintiff's] unfair dealing." In addition, the record supports the court's conclusion that Collins had authority to do so pursuant to his majority stake in BAHR. The plaintiff may very well have reasonably expected to be employed by the cafe as its manager at the inception of BAHR, to remain as a manager of BAHR, and to have unobstructed access to both the cafe's premises and its bank accounts. Although those expectations may have, at one point, been reasonable, "it must be recognized that 'reasonable expectations' do not run only one way. To the extent that [the plaintiff] may have entertained 'reasonable expectations' of profit . . . the other shareholders also entertained 'reasonable expectations' of fidelity and honesty from him. All such expectations were shattered when [the plaintiff] stole from the corporation. His own acts broke all bargains. . . . Since then, the only expectations he could reasonably entertain were those of a discovered thief: ostracism and prosecution." (Citation omitted.) *Gimpel* v. *Bolstein*, supra, 125 Misc. 2d 52.

To this end, we further note that, although it was the plaintiff's own misconduct which prompted the complained of acts he has alleged as oppressive, that misconduct does not obviate the need for the court to consider whether he continued to have reasonable expectations as a minority member. See *Gimpel* v. *Bolstein*, supra, 125 Misc. 2d 53 (although minority shareholder embezzled company funds, "it does not necessarily follow that the majority shareholders may treat him as shabbily as they please"). While the plaintiff cannot establish oppression based on his termination of employment—or based on his being prevented from unfettered access to the cafe or BAHR's bank accounts—we emphasize that the plaintiff cannot be marginalized to the extent that he would be precluded from realizing what reasonable expectation he still

maintains as a minority member.[26] See id., 55 ("While [the minority shareholder's] past misdeeds provided sufficient justification for the majority's acts to date, there is a limit to what he can be forced to bear . . . . The other shareholders need not allow him to return to employment with the corporation, but they must by some means allow him to share in the profits." (Citation omitted.)).

Should the court find that the other acts taken by Collins were oppressive, the plaintiff's prior malfeasance should not bar his pursuit of an appropriate remedy under § 34-267 (a) (5).[27] This is so because, so long as the plaintiff retains an investment in BAHR, his reasonable expectations include being entitled to certain minimum rights as a minority member. See *Gimpel* v. *Bolstein*, supra, 125 Misc. 2d 53 (although termination from employment for embezzling corporate funds was not oppression, minority shareholder was entitled to participate as "stranger" which includes "possible entitlement to dividends, voting at shareholders' meetings, and access to corporate records"). An infringement of these rights and a bar to any remedy leaves the plaintiff with a worthless asset. See *Brenner* v. *Berkowitz*, supra, 134 N.J. 505; *Meiselman* v. *Meiselman*, supra, 309 N.C. 291. We therefore conclude that a remand to the trial court for a new trial is warranted due to the court's failure to apply the correct legal standard as to the plaintiff's oppression claim under § 34-267 (a) (5).

The judgment is reversed with respect to the plaintiff's claim for a dissolution of BAHR on the ground of oppression pursuant to § 34-267 (a) (5) (B), and with respect to BAHR's counterclaim for breach of fiduciary duty to the extent that the court improperly applied a six year, instead of a three year, statute of limitations, and the case is remanded for a new trial consistent with this opinion; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The plaintiff also appears to assert two other claims, specifically, that the trial court improperly found that Collins did not breach (1) the operating agreement or (2) a fiduciary duty. To the extent that the plaintiff asserts these claims—either independent from, or as a basis for, his claim of oppression—we conclude that these claims are inadequately briefed and, thus, decline to review them. It is well established that the appellate courts of this state "are not obligated to consider issues that are not adequately briefed. . . . Whe[n] an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived. . . . In addition, mere conclusory assertions regarding a claim, with no mention of relevant authority and minimal or no citations from the record, will not suffice." (Citations omitted; internal quotation marks omitted.) *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 87, 942 A.2d 345 (2008). "[F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed . . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.) *Nowacki* v. *Nowacki*, 129

Conn. App. 157, 163–64, 20 A.3d 702 (2011) (per curiam).

The plaintiff's briefing of the aforementioned claims is deficient in many respects. Primarily, the plaintiff provides virtually no analysis of his claims. His principal brief contains only two sentences referencing his claim that Collins' refusal to provide BAHR's financial information was a breach of the operating agreement and General Statutes § 34-255i. Instead, the relevant section in the plaintiff's principal brief appears to primarily focus on Collins acting in an oppressive manner under § 34-267. See part III of this opinion. Although the plaintiff appears to provide a more pointed discussion of these claims in his reply brief, "we consider an argument inadequately briefed when it is delineated only in the reply brief." *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 378 n.6, 3 A.3d 892 (2010).

[2] The operating agreement defines "[p]riority [m]ember [l]oans" as additional loans made by members of BAHR "for the acquisition of assets, build-out, construction, working capital and other purposes." (Internal quotation marks omitted.) In addition, priority member loans do not increase any member's share of allocations, distributions, or interest, but do constitute a priority debt obligation of BAHR at an annual 7 percent interest rate. Importantly, § 11 of the operating agreement provides that "while any principal balance remains outstanding and unpaid on any [p]riority [m]ember [l]oan, any decisions which are to be made by the [m]embers, rather than the [m]anager, shall be made by a 60 [percent] majority vote or consent of the [m]embers."

[3] Of the $149,000 that Collins loaned to BAHR, Collins acquired approximately $100,000 of that amount through a loan from his bank, UBS, which was secured by his retirement account.

[4] Affixed to the operating agreement was a schedule A detailing each members' capital contribution, the priority loan amounts, and their respective percentage interest in BAHR. That document was initialed and dated by both Collins and the plaintiff.

[5] The plaintiff was the only person who had the ability to issue checks on behalf of BAHR and was in control of issuing himself checks for his weekly salary.

[6] On appeal, the plaintiff does not challenge the court's finding that Collins is a 60 percent stakeholder in BAHR and, therefore, had authority to unilaterally amend the operating agreement.

[7] The trial court found that, in addition to taking these actions, Collins' attorney had filed an interim report with the Secretary of the State, which unintentionally omitted the plaintiff as a member of BAHR.

[8] The plaintiff also alleged claims of unpaid wages and theft under General Statutes §§ 31-72 and 52-564 against BAHR for Collins' cancellation of the nine $1000 checks that the plaintiff issued to himself as his weekly salary. During trial, however, the plaintiff withdrew those claims.

[9] BAHR's counterclaim consisted of two counts. The first count asserted a claim of larceny in violation of General Statutes § 53a-119, as to which the court found in favor of the plaintiff. That claim is not a subject of this appeal. For purposes of clarity, we refer to the second count of BAHR's counterclaim—the nature of which is disputed on appeal; see part II of this opinion—as the counterclaim.

[10] The plaintiff's special defenses stated that (1) any benefits that were paid to him were authorized by Collins and BAHR, (2) BAHR was estopped from asserting such counterclaims, (3) BAHR's second counterclaim was time barred, and (4) BAHR's counterclaims failed to state a claim upon which relief could be granted.

[11] We note that, in challenging the legal sufficiency of BAHR's counterclaim, the plaintiff only raised his challenge by asserting it as a special defense in his responsive pleading. The plaintiff did not file a motion to strike the counterclaim for failure to state a claim upon which relief could be granted, and he did not raise this issue at any point during the underlying proceedings.

As this court has previously acknowledged, "there is a split of authority among our trial court judges with respect to whether failure to state a claim upon which relief can be granted constitutes a valid special defense." *Sharp Electronics Corp.* v. *Solaire Development, LLC*, 156 Conn. App. 17, 33 n.11, 111 A.3d 533 (2015). We are doubtful that such a practice conforms with our rules that govern an attack on a pleading for a failure to state a claim. See Practice Book §§ 10-7 and 10-39 (a); see also *Rogan* v. *Rungee*, 165 Conn. App. 209, 215–16 n.3, 140 A.3d 979 (2016) (plaintiff's filing of answer with special defense to counterclaim and failure to file motion to strike resulted in waiver of right to challenge legal sufficiency of counterclaim).

A special defense serves a unique purpose—"to plead facts that are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action." *Grant* v. *Bassman*, 221 Conn. 465, 472–73, 604 A.2d 814 (1992); see also Practice Book § 10-50. By pleading that "[BAHR's] counterclaims fail to state claims upon which relief can be granted," the plaintiff has attempted to assert a legal sufficiency claim by way of a special defense.

We will not resolve this particular issue based on the record before us. First and foremost, none of the parties distinctly raised the issue before the trial court during the underlying proceedings, nor did the court address the issue or the plaintiff's special defense in its memorandum of decision. Moreover, BAHR has not raised the issue on appeal. Although this court has the authority to raise an issue sua sponte, "the burden ordinarily is on the parties to frame the issues, and the presumption is that issues not raised by the parties are deemed waived." *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 164, 84 A.3d 840 (2014). Thus, we leave for another day the issue of whether a party may properly assert, by way of a special defense, that a count fails to state a claim upon which relief may be granted.

[12] As discussed in footnote 18 of this opinion, General Statutes (Rev. to 2017) § 34-141 was repealed pursuant to Public Acts 2016, No. 16-97, § 110, and replaced by the Connecticut Uniform Limited Liability Company Act (CULLCA), General Statutes § 34-243 et seq. General Statutes (Rev. to 2017) § 34-141, however, was in effect at the time the plaintiff allegedly breached his fiduciary duties to BAHR.

[13] General Statutes § 52-576 provides in relevant part: "(a) No action for an account . . . shall be brought but within six years after the right of action accrues, except as provided in subsection (b) of this section. . . ."

[14] General Statutes § 52-577 provides: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

[15] We further observe that BAHR did not appear to consider its counterclaim as setting forth a cause of action for an accounting. Specifically, in its posttrial brief, BAHR made no argument that an accounting was needed as a result of the plaintiff's breach of his fiduciary duty. Rather, BAHR explicitly stated that its counterclaim "alleges a claim for a breach of the foregoing fiduciary duty" and limited its analysis to arguing that such a breach occurred.

[16] In reaching this conclusion, we acknowledge that the remedy of an accounting may take the form of either equitable or legal relief. See *Zuch* v. *Connecticut Bank & Trust Co.*, supra, 5 Conn. App. 460–61. Indeed, "[t]he right to accounting is not absolute, but should be accorded only on equitable principles." (Internal quotation marks omitted.) *Papallo* v. *Lefebvre*, supra, 172 Conn. App. 764. The balancing of the equities generally is entrusted to the discretion of the trial court. See *Mankert* v. *Elmatco Products, Inc.*, supra, 84 Conn. App. 459.

The record, however, provides little indication that the court employed any equitable balancing or considered BAHR's counterclaim as sounding in a claim for an accounting. The court's memorandum of decision is largely silent with respect to BAHR's request for an accounting, and the court makes only a single reference to that request when summarizing BAHR's request for relief. Absent from the decision is any order for an accounting or any indication that it was exercising a discretionary, equitable function. See *Episcopal Church in the Diocese of Connecticut* v. *Gauss*, supra, 302 Conn. 457–58 (court acted within its discretion when it explicitly invoked its equitable authority to order accounting to protect its original judgment). Even if we were to assume otherwise, the deficiencies in BAHR's pleadings, and the fact that its damages were readily ascertainable, leave no room for discretion. See *Zuch* v. *Connecticut Bank & Trust Co.*, supra, 5 Conn. App. 461–62 (because plaintiff failed to allege demand and refusal in its claim for accounting, court improperly found that complaint sufficiently stated claim for accounting); see also *Papallo* v. *Lefebvre*, supra, 172 Conn. App. 764 (in holding that court was within discretion to deny request for accounting of bartering agreement, noting that accounting would nevertheless be inappropriate because plaintiffs "had records pertaining to the defendant's use of [the bartering agreement], and therefore any loss was ascertainable").

[17] The relevant allegations of oppression include that Collins (1) stopped payment on nine $1000 checks, (2) filed an interim report with the Connecticut Secretary of the State that failed to list the plaintiff as a member of BAHR, (3) terminated the plaintiff's son from employment by the cafe, (4)

refused to provide the plaintiff with distributions, and (5) refused to provide the plaintiff with BAHR's financial documents

[18] The defendants further argue—in a footnote in their brief—that the plaintiff's reliance on the Connecticut Uniform Limited Liability Company Act (CULLCA), General Statutes § 34-243 et seq., is improper and inapplicable due to its savings clause. See General Statutes § 34-283b ("[s]ections 34-243 to 34-283d, inclusive, do not affect an action commenced, proceeding brought or right accrued before July 1, 2017"). Upon our review of the record, however, Collins never brought this issue to the trial court's attention at any point during the underlying proceedings.

To the contrary, BAHR itself relied on the CULLCA throughout its posttrial brief. Moreover, in a reply to the plaintiff's objection to BAHR's motion for leave to file an amended counterclaim, BAHR argued that "[t]he [CULLCA] was effective July 1, 2017, and [General Statutes] § 34-255h (i) (1) applies retroactively to the plaintiff's conduct." In that pleading, BAHR further alleged that the "[p]laintiff is well aware of the applicability of that act" and was granted permission to amend his complaint accordingly. In seeking permission to amend the complaint, the plaintiff expressly stated that the amendment was necessary in order "to reference applicable provisions of [the] [CULLCA], [§] 34-243 et seq., effective July 1, 2017 . . . ." The defendants did not object to the amendment. Given the defendants' failure to object to the amended complaint and their reliance on CULLCA before the trial court, it is unsettling that the defendants now claim on appeal, for the first time, that CULLCA is inapplicable. In light of the foregoing, we consider the defendants' alternative argument regarding the applicability of CULLCA unpreserved, and therefore decline to address it on appeal. See *Travelers Casualty & Surety Co. of America* v. *Netherlands Ins. Co.*, 312 Conn. 714, 761–62, 95 A.3d 1031 (2014).

[19] The Connecticut Limited Liability Company Act (CLLCA), General Statutes (Rev. to 2017) § 34-100 et seq., has since been repealed and replaced by the CULLCA. See Public Acts 2016, No. 16-97, § 110; see also *Saunders* v. *Briner*, 334 Conn. 135, 139 n.1, 221 A.3d 1 (2019). For purposes of convenience, all references to the CLLCA in this opinion are to the 2017 revision of the General Statutes.

[20] It is well established that a limited liability company (LLC) is a "distinct business entity that adopts and combines features of both partnership and corporate forms." (Internal quotation marks omitted.) *418 Meadow Street Associates, LLC* v. *Clean Air Partners, LLC*, 304 Conn. 820, 834 n.13, 43 A.3d 607 (2012). Our Supreme Court has recognized "the closely held nature of many [limited liability companies]" (Internal quotation marks omitted.) *Saunders* v. *Briner*, 334 Conn. 135, 162 n.28, 221 A.3d 1 (2019). Scholars that have examined the oppression doctrine have analogized minority members of a limited liability company (LLC) to minority shareholders of close corporations. See generally F. O'Neal & R. Thompson, Oppression of Minority Shareholders and LLC Members (Rev. 2d Ed. 2011) § 6:2, pp. 6-2 through 6-4 (analyzing similarities between minority shareholders of close corporation and minority member of LLC in context of oppression); see also D. Moll, "Minority Oppression & The Limited Liability Company: Learning (Or Not) From Close Corporation History," 40 Wake Forest L. Rev. 883, 925–57 (2005) (in arguing that oppression claims should be available to minority members of LLC, noting that such members share many characteristics of minority shareholders of close corporation).

Additionally, we note that courts of other states have applied corporate principles governing oppression claims to minority members of LLCs. See, e.g., *Pointer* v. *Castellani*, 455 Mass. 537, 549–51, 918 N.E.2d 805 (2009) (holding LLC is close corporation and applying corporate principles of oppression doctrine to minority member's oppression claim); see also F. O'Neal & R. Thompson, Oppression of Minority Shareholders and LLC Members (Rev. 2d Ed. 2020) § 6:3 ("Elsewhere, courts in many jurisdictions refer explicitly to close corporation precedent in addressing LLC issues. Given the overlap of close corporations and LLCs, courts regularly apply close corporation rules to its newer legal cousins . . . .") Furthermore, the commentary to the RULLCA explicitly looks to close corporation law in defining the contours of oppression under the act, despite acknowledging that doing so "requires some caution." Rev. Unif. Limited Liability Company Act of 2006 (2013) § 701, comment, 6C U.L.A., supra, 135.

Given that a minority shareholder of a close corporation and a minority member of an LLC share many traits which make them vulnerable to oppression, and mindful of the commentary's guidance, we believe that the governing principles of close corporation law are instructive for our interpretation

of the term "oppression" as it appears in the CULLCA. For purposes of convenience, we use the terms "LLC" and "close corporation" interchangeably.

[21] Additionally, we note that at least one appellate court in this country has also applied the "reasonable expectations" standard for analyzing claims of oppression under its state's version of the RULLCA. See *Morse* v. *Rosendhal*, Court of Appeals of Iowa, Docket No. 15-0912, 885 N.W.2d 220, 2016 WL 3273725, *5–6 (Iowa App. June 15, 2016) (unpublished opinion).

[22] Furthermore, we agree with the New York Court of Appeals that "[i]t would be contrary to the remedial purpose [of involuntary dissolution] to permit its use by minority shareholders as merely a coercive tool . . . ." (Citations omitted.) *Matter of Kemp & Beatley, Inc.*, supra, 64 N.Y.2d 74. Thus, a plaintiff is not entitled to seek dissolution under § 34-267 (a) (5) when his or her own acts—resulting in the alleged oppressive conduct— were "made in bad faith and undertaken with a view toward forcing an involuntary dissolution . . . ." (Citations omitted.) Id.

[23] As we previously noted, the plaintiff does not challenge the court's conclusion that Collins had authority to unilaterally amend the operative agreement by virtue of his status as a 60 percent stakeholder in BAHR. See footnote 6 of this opinion.

[24] In fact, during trial, the court expressly disallowed any testimony about the plaintiff's expectations upon forming BAHR with Collins and sustained an objection by the defendants on the basis that such testimony was irrelevant.

[25] We further believe that the court's finding that the plaintiff failed to show that he was harmed does not appear to take into account the particular harms that arise from oppressive conduct *relative to the plaintiff's status as a minority member*. For instance, the court concluded that the plaintiff was not harmed by the defendants' failure to provide him with BAHR's financial documents because they were produced during the discovery process. This conclusion indicates that the court not only failed to consider the unique harms suffered by the plaintiff as a minority member, but it additionally ignored the fact that the plaintiff alleged these harms as a ground for oppressive conduct. See *Brenner* v. *Berkowitz*, supra, 134 N.J. 507. It was not until litigation proceedings began that the plaintiff received the company documents he believed he was entitled to. It would contravene the purposes of § 34-267 (a) (5) if the only way that a minority member could exercise his or her rights would be to rely on the discovery process in the course of legal proceedings. Because the court did not appear to apply the correct legal standard for determining harm, we cannot affirm the court's judgment on that basis.

[26] Given the atypical expectations of a minority member in an LLC, it is implausible that such a member would have committed capital to a venture in the knowledge that he or she could be entirely precluded from realizing any return on his or her investment. As one scholar on this issue has commented, a minority shareholder simply does not bargain for such a potentiality: "[I]t seems likely that minority shareholders would have refused to invest in the venture if the majority shareholder had insisted upon the retention of his freeze-out discretion. In other words, to appease the minority shareholders and to induce them to commit capital to the business, the majority shareholder would likely have had to promise that his freeze-out discretion would not be utilized." D. Moll, supra, 53 Vand. L. Rev. 799–800.

[27] We emphasize that dissolution is not the sole remedy for oppression of a minority member. In fact, § 34-267 (b) expressly permits a court to "order a remedy other than dissolution" for a proceeding brought under § 34-267 (a) (5). In providing for these alternatives, this provision of the CULLCA suggests that the drafters acknowledged the extreme and drastic nature of dissolution as a remedy. Cf. *Bator* v. *United Sausage Co.*, 138 Conn. 18, 22, 81 A.2d 442 (1951) (holding that dissension among corporation members "is not a ground for dissolution unless it goes so far as to render it impossible to carry on the corporate affairs"); see also *Bontempo* v. *Lare*, supra, 444 Md. 368 ("dissolution is an extreme remedy and should be avoided if less drastic equitable remedies are available); *Brenner* v. *Berkowitz*, supra, 134 N.J. 511 (dissolution is "an extreme remedy to be imposed with caution after a careful balancing of the interests at stake"); *Scott* v. *Trans-System, Inc.*, supra, 148 Wn. 2d 718 (concluding that facts of case "do not rise to the level of egregiousness required to justify dissolution given the admonishments from courts in this state and around the country that dissolution is a drastic remedy that should be used with extreme caution").

In *Bontempo* v. *Lare*, supra, 444 Md. 368–69, the Court of Appeals of Maryland adopted a nonexhaustive list of alternative remedies to dissolution

for oppressive conduct that a court has at its disposal:

"(a) The entry of an order requiring dissolution of the corporation at a specified future date, to become effective only in the event that the stockholders fail to resolve their differences prior to that date;

"(b) The appointment of a receiver, not for the purposes of dissolution, but to continue the operation of the corporation for the benefit of all the stockholders, both majority and minority, until differences are resolved or 'oppressive' conduct ceases;

"(c) The appointment of a 'special fiscal agent' to report to the court relating to the continued operation of the corporation, as a protection to its minority stockholders, and the retention of jurisdiction of the case by the court for that purpose;

"(d) The retention of jurisdiction of the case by the court for the protection of the minority stockholders without appointment of a receiver or 'special fiscal agent';

"(e) The ordering of an accounting by the majority in control of the corporation for funds alleged to have been misappropriated;

"(f) The issuance of an injunction to prohibit continuing acts of 'oppressive' conduct and which may include the reduction of salaries or bonus payments found to be unjustified or excessive;

"(g) The ordering of affirmative relief by the required declaration of a dividend or a reduction and distribution of capital;

"(h) The ordering of affirmative relief by the entry of an order requiring the corporation or a majority of its stockholders to purchase the stock of the minority stockholders at a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price;

"(i) The ordering of affirmative relief by the entry of an order permitting minority stockholders to purchase additional stock under conditions specified by the court;

"(j) An award of damages to minority stockholders as compensation for any injury suffered by them as the result of 'oppressive' conduct by the majority in control of the corporation."

See also *Brenner* v. *Berkowitz*, supra, 134 N.J. 514–15 (providing similar list of nonexclusive equitable remedies, short of dissolution, for oppressed minority shareholder).

We further note that, in fashioning a less drastic remedy, "a court should take into account not only the reasonable expectations of the oppressed minority [member], but also the expectations and interests of others associated with the company." *Bontempo* v. *Lare*, supra, 444 Md. 370. To do so necessarily requires a balancing of factors to make an equitable determination, and, therefore, is left to the sound discretion of the trial court. See *T & M Building Co.* v. *Hastings*, 194 Conn. App. 532, 551, 221 A.3d 557 (2019), cert. denied, 334 Conn. 926, 224 A.3d 162 (2020).